**2013-5122, 2014-5002**

# United States Court of Appeals
# for the Federal Circuit

OTAY MESA PROPERTY, L.P., RANCHO VISTA DEL MAR,
OTAY INTERNATIONAL, LLC, OMC PROPERTY, LLC,
D & D LANDHOLDINGS, LP, and INTERNATIONAL INDUSTRIAL
PARK, INC., (also known as Rancho De La Fuente),

*Plaintiffs-Appellant,*

and

KYDDLP & RDLFGFT NO. 1, LLC.,

*Plaintiff,*

*v.*

UNITED STATES,

*Defendant-Cross-Appellant.*

*Appeals from the United States District Court of Federal Claims in Consolidated
Nos. 06-CV-0167, 06-CV-0876, 06-CV-0877, 06-CV-1670, and 06-CV-1671
Judge Thomas C. Wheeler.*

## BRIEF FOR PLAINTIFFS-APPELLANTS

ROGER J. MARZULLA
NANCIE G. MARZULLA
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 882-6760

December 9, 2013          *Counsel for Plaintiffs-Appellants*

## Certificate of Interest

Counsel for the Plaintiffs-Appellants certifies the following:

1.     The full name of every party or amicus represented by me is:

Otay Mesa Property, L.P., Rancho Vista Del Mar, Otay International, LLC, OMC Property, LLC, D & D Landholdings, LP, and International Industrial Park, Inc. (also known as Rancho De La Fuente).

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by me are:

None.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Nancie G. Marzulla
Roger J. Marzulla
Marzulla Law, LLC

# Table of Contents

Certificate of Interest ............................................................................i

Table of Authorities ............................................................................iv

Statement of Related Cases..................................................................ix

Statement of Jurisdiction.......................................................................x

Plaintiffs-Appellants' Opening Brief.......................................................1

Statement of the Issues.........................................................................5

Statement of the Case...........................................................................6

Factual Background ............................................................................10

      A.    Subject Property .....................................................................10

      B.    Seismic intrusion sensors on Otay Mesa's property ...........13

      C.    The Government's concession of liability .........................15

      D.    Effect of the easement on development of the property ....17

      E.    Otay Mesa has sold dozens of valuable easements on or near the subject property, demonstrating value ...............18

Summary of the Argument....................................................................19

Argument.............................................................................................23

I.      Standard of Review.....................................................................23

II.     The trial court refused to award interest from the date of the taking, and the damages award thus fell short of the Fifth Amendment's just compensation requirement ............................................................................24

III.    The trial court's determination that the easement burdening
        278 acres of Otay Mesa's developable property had no value
        at all is clearly erroneous ..................................................................... 31

        A.      Otay Mesa met its burden to prove a reasonable approximation of its
                damages ............................................................................... 33

        B.      The trial court improperly ignored  the evidence that sophisticated
                parties—including the Border Patrol—had paid substantial amounts
                for easements over Otay Mesa's property .......................................... 37

        C.      By imposing additional uncertainties and costs of development the
                easement decreases the value of Otay Mesa's 278 acres of
                developable property ....................................................................... 40

Conclusion ........................................................................................................... 46

# Table of Authorities

## Cases

*Aaron v. United States*,
167 Ct. Cl. 818 (1964) ........................................................36

*American Pelagic Fishing Co. v. United States*,
379 F.3d 1363 (Fed. Cir. 2004) ................................... 23, 24

*Ark. Game & Fish Comm'n v. United States*,
2013 WL 6231552  (Fed. Cir. Dec. 3, 2013)........................34

*Branning v. United States*,
6 Cl. Ct. 618 (1984) ..........................................................35

*Brooks-Scanlon Corporation v. United States*,
265 U.S. 106 ......................................................................24

*Clemens Construction Co. v. United States*,
160 Ct. Cl. 675 (1963) .......................................................35

*Coast Indian Community v. United States*,
213 Ct. Cl. 129 (1977) .......................................................23

*Dee Hong Lue v. United States*,
150 Ct. Cl. 655 (1960) .......................................................35

*Dynamics Corp. of Am. v. United States*,
766 F.2d 518 (Fed. Cir. 1985) ...........................................21

*Economic Dev. & Indus. Corp. of Boston*,
13 Cl. Ct. 590 (1987) .................................................. 26, 27

*Foster v. United States*,
3 Cl. Ct. 738 (1983) ................................................... 27, 37

iv

*Glendale Fed. Bank, FSB v. United States*,
239 F.3d 1374 (Fed. Cir. 2001) ........................................................23

*Heydt v. United States*,
38 Fed. Cl. 286 (1997) .............................................................. 26, 27

*Huntley v. United States*,
133 Ct. Cl. 226 (1955) ...................................................................34

*United States v. 117,763 Acres*,
410 F. Supp. 628 (S.D. Cal. 1976)...................................................33

*Ind. Mich. Power Co. v. United States*,
422 F.3d 1369 (Fed. Cir.2005) .......................................................34

*International Industrial Park, Inc. v. United States*,
100 Fed. Cl. 638 (2011) ............................................................ 19, 40

*ITT Corp. v. United States*,
17 Cl. Ct. 199 (1989) ...................................................... 3, 10, 20, 28

*Jacobs v. United States*,
290 U.S. 13 (1933).......................................................... 3, 9, 20, 24, 28

*Kimball Laundry Co. v. United States*,
338 U.S. 1 (1949)........................................................................ 35, 40

*King v. United States*,
205 Ct. Cl. 512 (1974) ....................................................................25

*Kirby Forest Indus., Inc. v. United States*,
467 U.S. 1 (1984)................................................................... passim

*Miller v. United States*,
223 Ct. Cl. 352 (1980) ................................................................ 25, 35

*Moore v. United States*,
61 Fed. Cl. 73 (2004)......................................................................26

v

*NRG Co. v. United States*,
  31 Fed. Cl. 659 (1994) ............................................................ 8, 26, 28

*Otay Mesa Property, L.P. v. United States*,
  670 F.3d 1358 (Fed. Cir. 2012) ....................................................passim

*Otay Mesa Property, L.P. v. United States*,
  86 Fed. Cl. 774 (2009) ............................................................ passim

*Otay Mesa Property, L.P. v. United States*,
  93 Fed. Cl. 476 ................................................................. passim

*Otay Mesa Property, L.P. v. United States*,
  110 Fed. Cl. 732 (2013) ......................................................... 2, 10, 11

*Otay Mesa Property, L.P. v. United States*,
  111 Fed. Cl. 422 (2013) ................................................. 10, 19, 20, 28 29

*Phelps v. United States*,
  274 U.S. 341 (1927) ................................................................. 24

*Precision Pine & Timber Co. v. United States*,
  596 F.3d 817 (Fed. Cir.2010) ....................................................... 34

*Procter & Gamble Distrib. Co. v. Sherman*,
  2 F.2d 165 (S.D.N.Y. 1924) ......................................................... 27

*Ridge Line, Inc. v. United States*,
  346 F.3d 1346 (Fed. Cir. 2003) ..................................................... 34

*Seaboard Air Line Ry. Co. v. United States*,
  261 U.S. 299 (1923) ............................................................... 21, 24

*Shelden v. United States*,
  34 Fed. Cl. 355 (1995) .............................................................. 26

*Sioux Nation of Indians v. United States*,
  220 Ct. Cl. 442 (1979) .............................................................. 25

*St. Genevieve Gas Co., Inc. v. Tennessee Valley Auth.*,
    747 F.2d 1411 (11th Cir. 1984) ........................................................33

*Toronto, Hamilton &Buffalo Nav. Co. v. United States*,
    116 Ct. Cl. 184 (1950) ..................................................................23

*Tulare Lake Basin Water Storage District v. United States*,
    59 Fed. Cl. 246 (2003) ..................................................................26

*United States v. 22.80 Acres*,
    839 F.2d 1362 (9th Cir. 1988) ........................................................36

*United States v. Miller*,
    317 U.S. 369 (1943)................................................................. 36, 35

*United States v. Silver Queen Mining Co.*,
    285 F.2d 506 (10th Cir. 1960) ........................................................36

*United States v. Thayer-West Point Hotel Co.*,
    329 U.S. 585 (1947)................................................................. 2, 24

*Vaizburd v. United States*,
    67 Fed. Cl. 499 (2005) ..................................................................26

*Whitney Benefits v. United States*,
    926 F.2d 1169 (Fed. Cir. 1991) ......................................................25

*Whitney Benefits, Inc. v. United States*,
    18 Cl. Ct. 394 (1989) ....................................................................27

*Whitney Benefits, Inc. v. United States*,
    30 Fed.Cl. 411 (1994) ............................................................ passim

*Yaist v. United States*,
    17 Cl. Ct. 246 (1989) ............................................................. 26, 36

## Statutes

28 U.S.C. § 1295(a)(3).......................................................................x

28 U.S.C. § 1491(a) ..........................................................................x

40 U.S.C. § 3116..............................................................................26

## Secondary Sources

Ronald L. Baird, *Easement Condemnation and State v. Doyle: Fair Market Value Without a Market*, 6 Alaska L. Rev. 199 (Dec. 1989).........................................36

C.T. Drechsler, *Interest on damages for period before judgment for injury to, or detention, loss, or destruction of, property*, 36 A.L.R.2d 337.................. 3, 20, 27

## Statement of Related Cases

In accordance with Rule 47.5 of this Court, counsel for Plaintiffs-Appellants states that there was a prior appeal to this Court from the final judgment in No. 06-0167, captioned *Otay Mesa Property, L.P. v. United States*, Nos. 2011-5002 and 2011-5008, published at 670 F.3d 1358 (Fed. Cir. 2012). That appellate panel was composed of Judge Pauline Newman, Judge Alvin A. Schall, and Judge Kimberly A. Moore.

Counsel are aware of no pending cases that will directly affect or that will be directly affected by this Court's decision in this appeal.

## Statement of Jurisdiction

The U.S. Court of Federal Claims had jurisdiction over this case, brought under the Just Compensation Clause of the Fifth Amendment and 28 U.S.C. § 1491(a), the Tucker Act. The Court of Federal Claims ordered that final judgment be entered in this case on July 22, 2013, disposing of all claims, in accordance with RCFC 54(b).[1] This Court has jurisdiction over all appeals from final decisions of the CFC under 28 U.S.C. § 1295(a)(3).

Plaintiffs-Appellants filed a timely notice of appeal on July 24, 2013.[2] Because the parties then entered into settlement discussions—which unfortunately were unsuccessful—Plaintiffs-Appellants sought and were granted two enlargements of time for filing their opening brief, to December 9, 2013.[3]

---

[1] Order for Entry of Final Judgment, Doc. No. 276 (July 22, 2013).
[2] Pls.' Notice of Appeal, Doc. 278 (July 24, 2013).
[3] *See* Order Granting Motion to Extend Time, Doc. 9 (Sept. 20, 2013); Order Granting Motion to Extend Time, Doc. 13 (Oct. 23, 2013).

x

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

### 2013-5122, 2014-5002

---

OTAY MESA PROPERTY, L.P., RANCHO VISTA DEL MAR, OTAY
INTERNATIONAL, LLC, OMC PROPERTY, LLC, D & D LANDHOLDINGS,
LP and INTERNATIONAL INDUSTRIAL PARK, INC. (also known as Rancho
De La Fuente),

Plaintiffs-Appellants,

and

KYDDLP & RDLFGFT NO. 1, LLC,

Plaintiff,

v.

UNITED STATES

Defendant-Cross-Appellant.

---

Appeal from the United States Court of Federal Claims in consolidated nos.
06-CV-0167, 06-CV-0876, 06-CV-0877, 06-CV-1670 and 06-CV-1671,
Judge Thomas C. Wheeler

---

### Plaintiffs-Appellants' Opening Brief

This taking case comes again before this Court on a second appeal. In the

first appeal, this Court reversed the trial court's award of just compensation finding

that the easement taken by the Government was permanent, not temporary.[4]

Specifically, this Court held that the Government had taken a permanent, blanket easement over 897 acres of Plaintiffs-Appellants' (collectively "Otay Mesa") commercial (developable) and mitigation property located immediately adjacent to the U.S. and Mexican border in the Otay Mesa area of San Diego County, California.[5] This Court remanded the case back to the trial court to determine damages for the taking of a permanent, blanket easement on the property.[6]

But on remand, the trial court again committed reversible error in two respects. First, the trial court erred in failing to award interest from the date of taking (commencing April 1999), and instead—citing no authority—limited Otay Mesa's interest to the time commencing from the date that the Government filed its unilateral concession of liability, August 2008.[7] But "it has consistently been held that the Fifth Amendment's reference to just compensation entitles the property owner to receive interest from the date of the taking to the date of payment as a part of his just compensation,"[8] and there is no case supporting the award of interest on an inverse condemnation damages award running from any date other

---

[4] *Otay Mesa Property, L.P. v. United States*, 670 F.3d 1358, 1360 (Fed. Cir. 2013).
[5] *Id.*
[6] *Id.* at 1368.
[7] *Otay Mesa Property, L.P. v. United States*, 110 Fed. Cl. 732, 747 (2013).
[8] *United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585, 589 (1947).

than the date of taking.[9]  Here, the Government has conceded in its stipulation of

liability that the dates on which sensors were physically installed on the property

serves as the date of taking:  "The easement shall be deemed to have commenced

on the date the sensor is listed as having been installed,"[10] and there is no dispute

that the Government's concession of liability provides the correct dates of taking

for each of the five parcels.[11]

The trial judge's failure to award interest from the dates of taking set forth in

the Government's concession of liability is therefore reversible error as a matter of

law.[12]

Second, the trial court's decision to award no compensation at all for the

278-acre easement burdening Otay Mesa's developable property was also clearly

erroneous.  The trial court had awarded Otay Mesa $726,831[13] in just

---

[9] *See, e.g.*, *Kirby Forest Indus. Inc. v. United States*, 467 U.S. 1, 10 (1984); *Jacobs v. United States*, 290 U.S. 13, 16–17 (1933); *Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411, 413 (1994); *ITT Corp. v. United States*, 17 Cl. Ct. 199, 240 (1989); *see also* C.T. Drechsler, *Interest on damages for period before judgment for injury to, or detention, loss, or destruction of, property*, 36 A.L.R.2d 337 § 2[b]((8)) (collecting cases).

[10] Pls.' 2012 Damages Ex. 1 ¶7, JA1824.

[11] Pls.' 2012 Damages Ex. 1 ¶5, JA1823.

[12] Notably, in its first damages judgment, the trial court did use the sensor installation dates for its interest rate calculation.  *Otay Mesa Property, L.P.*, 93 Fed. Cl. at 491.

[13] This figure is the amount of fair rental value the trial court held was appropriate for the entire subject property, $41.50 per acre per month, times the 278 acres of developable property, calculated from the date a sensor was first installed on that

compensation for this same 278-acre temporary easement in its first damages decision, but erroneously awarded no just compensation for the Government's taking a permanent easement over the property.

On remand, Otay Mesa met its burden of proving a reasonable approximation of damages, and the trial court erred as a matter of law by making no findings at all regarding Otay Mesa's uncontroverted evidence that it had sold dozens of easements on the subject and nearby property for prices of $58,000 per acre and up.[14] The trial court clearly erred when it accepted the Government's flawed argument that this Court had rejected as illogical in the prior appeal:

> The government has argued that, because the sensor easement is permanent, the compensation due Otay Mesa is much less than the compensation that would be due if the easement were temporary. We find this argument difficult to accept. It does not seem to us logical that Otay Mesa should receive less compensation for the taking of a permanent easement than it would for the taking of a temporary easement.[15]

The trial court's conclusion that the permanent easement was worth 85% less than the same easement if it were temporary is at whiplash odds with the evidence adduced at trial, including:

---

property, August 2003.  *See Otay Mesa Property, L.P. v. United States*, 93 Fed. Cl. 476, 480–481 (2010).

[14] Pls.' 2009 Damages Ex. 266(yy), JA1643–1644; Pls.' 2009 Damages Ex. 266(pp), JA1633–1642.

[15] *Otay Mesa Property*, 670 F.3d at 1368.

- The substantial amounts ($58,000 per acre and up) paid by utility companies and the Border Patrol itself for the purchase of dozens of easements over Otay Mesa's property;

- The additional time, cost, and work required to deal with the Border Patrol's easement during San Diego County's development process, making the 278 acres less desirable for development;

- The substantial fee value of the 278 acres burdened by the easement— $14,547,800;

- The trial court's first judgment valuing the same 278-acre easement at $726,831 (before interest).

The trial court was thus clearly erroneous in awarding nothing for the 278-acre easement and in awarding no interest from the date of taking until August 28, 2008.

For all of these reasons, Otay Mesa asks this Court to reverse the trial court's damages award and to remand this case with instructions to award interest from the dates of taking of each of the five parcels, together with a reasonable sum (more than zero) for the 278-acre easement on Otay Mesa's developable property.

**Statement of the Issues**

1. In an inverse condemnation action, the Fifth Amendment requires that the property owner receive interest from the date of the taking to the date of payment as a part of just compensation. Here, the date of taking for each of the five parcels is fixed by the Government's concession of liability. Did the

5

trial court err as a matter of law in refusing to award Otay Mesa interest from the date of taking?

2.     In finding that the 278-acre easement had no value, the trial court ignored Otay Mesa's uncontradicted evidence that it had sold dozens of easements on the subject and nearby property at $58,000 per acre and up, that the Border Patrol itself had purchased easements from Otay Mesa, and that the easement made development more costly and difficult. Was the trial court clearly erroneous in valuing the permanent easement on the developable land at zero?

## Statement of the Case

This is the second appeal in this Fifth Amendment taking case, in which Otay Mesa seeks just compensation for the Government's physical taking of an easement. That easement provides the Government with the right of unfettered ingress and egress on the entire 897-acre subject property to "locate, construct, operate, maintain and repair or replace"[16] underground seismic intrusion sensors at locations undisclosed to Otay Mesa, burdening valuable development and mitigation land in San Diego County, California adjacent to the U.S. and Mexican border.[17]

On August 29, 2008, the Government filed a concession of liability admitting, "it had taken a property interest in the nature of an easement"[18] over Otay Mesa's property. Based on that unilateral concession, the trial court held that

---

[16] Pls.' 2012 Damages Ex. 1 ¶7, JA1824.

[17] *Otay Mesa Property, L.P.*, 93 Fed. Cl. at 479.

[18] *Otay Mesa Property, L.P. v. United States*, 86 Fed. Cl. 774, 777 (2009).

the Government was liable for the physical taking of an easement over Otay

Mesa's property, reserving the calculation of damages.[19]

At the first damages trial in 2009, the Government asserted that the easement

"had no effect on the value of Plaintiffs' property" and asked the trial court to

"award nominal damages of $100 per parcel," relying on the opinion of its

appraiser, Robert Lea.[20]  Rejecting Lea's opinion, the trial court determined "that

Plaintiffs are entitled to just compensation of $3,043,051, plus interest" from the

date of taking for a temporary easement,[21] stating:

> The Court bases this conclusion on a finding that the Border Patrol
> possesses a temporary, non-exclusive, blanket easement to deploy
> seismic sensors on parcels 1, 3, 4, 5, and 10 . . . .  The easement is a
> "blanket" transaction on each of the five parcels, because the Border
> Patrol may change the location of any sensor whenever it desires, and
> its agents must have the ability to access the sensors at any time.[22]

Based on the Government's concession, the trial court further held that the

date of taking was "the date that a sensor first was installed on each parcel, so that

the valuation is performed on a parcel-by-parcel basis,"[23] and awarded Otay Mesa

interest from the date of taking, explaining:

> Plaintiffs must be compensated not only for the value of the
> Government's easement over its property but also for any delay in the
> Government's payment of that amount.  *See NRG Co. v. United*

---

[19] *Otay Mesa Property, L.P*, 86 Fed. Cl. at 776.

[20] *Otay Mesa Property, L.P.*, 93 Fed. Cl. at 479.

[21] *Id.*

[22] *Id.* at 479–480.

[23] *Id.* at 486.

*States,* 31 Fed. Cl. 659, 664 (1994).   Again, the purpose of just compensation is to "insure that [the property owner] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation."   *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10 (1984).[24]

On appeal, the Government argued "that the Court of Federal Claims erred in holding that the sensor easement was temporary, rather than permanent,"[25] and that the trial court erred in determining damages using fair rental value rather than the before-and-after method of valuation:  "According to the government, under the latter method, Otay Mesa is entitled to only a nominal award."[26]  The Government did not argue any error in the trial court's award of interest.

This Court reversed, holding that the easement was a permanent, not a temporary, taking:

> We hold that the Border Patrol's blanket easement to install, maintain, and service sensors on Otay Mesa's property constituted a permanent physical taking.[27]

But the Court rejected the Government's argument that only nominal damages were due for this permanent taking, finding it illogical that Otay Mesa should receive less for a permanent taking than for a temporary one:

> The government has argued that, because the sensor easement is permanent, the compensation due Otay Mesa is much less than the compensation that would be due if the easement were temporary.  We

---

[24] *Otay Mesa Property, L.P.,* 93 Fed. Cl. at 491.

[25] *Otay Mesa Property, L.P.,* 670 F.3d at 1364.

[26] *Id.* at 1363.

[27] *Id.* at 1365.

find this argument difficult to accept. It does not seem to us logical that Otay Mesa should receive less compensation for the taking of a permanent easement than it would for the taking of a temporary easement. In our view, this case aptly demonstrates that "just compensation" should be carefully tailored to the circumstances of each particular case.[28]

On remand, the trial court reversed course—this time, awarding interest from the date that the concession of liability was filed, not the date of taking as it had done in its first damages determination, although there is no dispute as to the dates of taking for the subject property, which are set out in the Government's concession of liability.[29] The dates of taking for the five parcels range from April 1999 to October 2004, depending on the date the first sensor was installed.[30] The trial court denied Otay Mesa's motion for reconsideration of the interest award, while acknowledging that caselaw provides for interest from the date of taking:

> The Court acknowledges the existence of ample case law holding that interest in a Fifth Amendment taking should run from the date of the taking. *See, e.g., Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (owner is entitled to interest so he is placed in as good a position as he would have occupied if payment had coincided with the taking); *Jacobs v. United States,* 290 U.S. 13, 16–17, 54 S.Ct. 26, 78 L.Ed. 142 (1933) (owner is entitled to interest to produce the equivalent of the value if paid at the time of the taking). This principle recognizes the time value of money and the opportunity a plaintiff has lost to earn income on its damages award. *Whitney Benefits, Inc. v. United States,* 30 Fed.Cl. 411, 413 (1994). A delay in payment is also a delay in the use of the

---

[28] *Otay Mesa Property, L.P.*, 670 F.3d at 1368.
[29] Pls.' 2012 Damages Ex. 1 ¶5, JA1823.
[30] *Id.*

money. *ITT Corp. v. United States,* 17 Cl. Ct. 199, 240 (1989).[31]

Although the trial court awarded Otay Mesa damages for the taking of a permanent easement over the 619 acres of mitigation land, it denied Otay Mesa all compensation for the 278-acre easement burdening its developable land, which had a fee value of $14,547,800.[32]  In reaching this conclusion, the trial court made no findings at all regarding the dozens of easements Otay Mesa had sold to utility companies—and even to the Border Patrol—on and near the subject property.  Nor did the trial court make findings regarding the undisputed testimony of San Diego land use attorney Eldred that the easement makes development of the land more difficult and expensive, nor the testimony of San Diego County Planning Department official Schick who corroborated Eldred on this point.

**Factual Background**

**A.    Subject Property**

Otay Mesa owns valuable commercial (developable) and environmentally (mitigation) sensitive property just north of the border between the United States and Mexico, near San Diego, California.  The subject property consists of 897 acres of land, Parcels 1, 4, 5, and 10, which have the highest and best use as commercial or industrial development or environmental mitigation in the before

---

[31] *Otay Mesa Property, L.P. v. United States*, 111 Fed. Cl. 422, 423 (2013).
[32] *Otay Mesa Property, L.P.*, 110 Fed. Cl at 734.

condition.[33]

Parcel 1 is an 89-acre parcel owned by Otay Mesa Property, L.P., located immediately north of the U.S.-Mexico border, about 1.5 miles directly east of the Otay Mesa Port of Entry.[34]  Parcel 1 is zoned Mixed Industrial, and is presently unimproved.[35]

Parcel 3 is a 393.6-acre parcel owned by Rancho Vista Del Mar, located immediately north of the U.S.-Mexico border, about 2 miles east of the Otay Mesa Port of Entry.[36]  Parcel 3 is zoned S-90, essentially a holding zoning, and is presently unimproved.[37]

Parcel 4 is a 160-acre parcel owned by Otay International, LLC, located about 930 feet north of the U.S.-Mexico border, about 2.5 miles from the Otay Mesa Port of Entry.[38]  Parcel 4 is zoned S-90, essentially a holding zoning, and Mixed Industrial, and is presently unimproved.[39]

Parcel 5 is a 120-acre parcel owned by Rancho Vista Del Mar, located about 1,285 feet north of the U.S.-Mexico border, about 2 miles directly east of the Otay

---

[33] *Otay Mesa Property, L.P.*, 110 Fed. Cl at 734.
[34] Pls.' 2012 Damages Ex. 6, Tagg Appraisal at 18, JA1860.
[35] *Id.* at 20, JA1862.
[36] *Id.* at 25, JA1867.
[37] *Id.* at 27, JA1869.
[38] *Id.* at 32, JA1874.
[39] *Id.* at 34, JA1876.

Mesa Port of Entry.[40]  Parcel 5 is zoned Mixed Industrial and Sensitive Resources,

and is presently unimproved.[41]

Parcel 10 is a 134.89-acre parcel owned by D&D Landholdings, L.P., and

located about three-quarters of a mile north of the U.S.-Mexico border and 2.5

miles northeast of the Otay Mesa Port of Entry.[42]  Parcel 10 is zoned Mixed

Industrial and Rural Residential, and is presently unimproved.[43]

The subject property lies directly in the path of a planned third-border

crossing and just east of an existing border crossing.[44]  The new international

border crossing, along with the planned State Road 11 to provide access to the

crossing, will be built on or near the western edge of Parcel 1, and portions of

Parcels 4 and 5 of the subject property.[45]  The resulting development expected on

Parcels 1, 4, and 5 will be similar to the development that occurred around the

Otay Mesa Port of Entry that opened in January of 1995, and will include

warehousing, distribution, truck stops, gas stations and fast food restaurants, as

well as an increase in demand for mitigation land on the subject parcels.[46]  The

---

[40] Pls.' 2012 Damages Ex. 6, Tagg Appraisal at 39, JA1881.

[41] *Id.* at 41, JA1883.

[42] *Id.* at 46, JA1888.

[43] *Id.* at 48, JA1890.

[44] De La Fuente, Liability Tr. 306:12–16, JA179; Wick, Liability Tr. 628:23–631:2, JA338–JA341; Def. 2009 Damages Ex. 700(39), JA1817.

[45] Tagg, 2009 Damages Tr. 766:5–23, JA1047; Pls.' 2012 Damage Ex. 6 at 79, JA1921.

[46] Tagg, 2009 Damages Tr. 772:20–773:13, JA1053–1054.

third border crossing vastly increases the retail development potential of the

subject property:

> The completion of proposed SR 905 to the existing IPOE
> [International Port of Entry], and SR 11 to the proposed second Otay
> Mesa Port of Entry, will further enhance the regional transportation
> infrastructure for the SPA [specific plan area].
>
> . . .
>
> The estimated retail demand potential for Otay Mesa residents,
> workers, lodging guests, and trade from Mexico, will support almost 1
> million square feet of retail space, or 87-acres of land, to the year
> 2030. Should the city's Otay Mesa Community Plan be amended to
> increase residential capacity by 8,000 units, the demand for retail
> space would increase to 109-acres. This information indicates an
> active retail market in South Bay, and a demand for additional
> commercial retail space in Otay Mesa.[47]

## B. Seismic intrusion sensors on Otay Mesa's property

In its concession of liability, the Government admits that, beginning in the

late 1990s and the early 2000s, the U.S. Border Patrol—without Otay Mesa's

knowledge or consent—installed a series of seismic intrusion sensors on Otay

Mesa's land to detect and intercept illegal immigrants crossing into the United

States through Otay Mesa's property.[48] These sensors are approximately one cubic

foot in size, with an antenna that extends another foot, and a detection cord that

extends approximately 20 feet.[49] The sensors are designed to detect ground motion

---

[47] Pls.' Liability Ex. 116 at 23–24, JA1599–1600.

[48] *Otay Mesa Property, L.P.*, 86 Fed. Cl. at 777.

[49] Herrera, 2009 Damages Tr. 846:16–18, JA1110.

within a 30 foot radius of the sensor base.[50]  These sensors account for 85% of all

apprehensions by the Border Patrol on the subject property.[51]

The Government has conceded liability for the taking of a blanket easement

for ingress and egress to install, maintain, operate and repair these sensors, starting

with the first sensor installation in April 1999.[52]

The sensors operate by picking up movement within a 25 to 30-foot radius,[53]

at which time they emit a radio signal to a Border Patrol dispatcher.[54]  Dispatch

then puts out a radio call to the Border Patrol agents working from the station to

which the sensor has been assigned.[55]  The agents then respond to that dispatch,

crossing Otay Mesa's property to intercept and to apprehend, if necessary, the

person who caused the sensor hit.[56]  Regardless of whether there is any activity in

their area, the sensors are set to "check in" every 24 hours to indicate that they are

still functioning.[57]  If a sensor does not check in for three to five days or it has not

---

[50] *Otay Mesa Property, L.P.*, 86 Fed. Cl. at 777; Herrera, 2009 Damages Tr. 824:23–825:2, 846:16–18, JA1088–1089, JA1110.
[51] *Otay Mesa Property, L.P.*, 86 Fed. Cl. at 790.
[52] Pls.' 2012 Damages Ex. 1, JA1818–1826.
[53] Herrera, 2009 Damages Tr. 825:1–2, JA1089.
[54] Hance, 2009 Damages Tr. 417: 22–418:2, JA860.
[55] Hance, 2009 Damages Tr. 418:3–7, JA861.
[56] Hance, 2009 Damages Tr. 418:8–15, JA861; Hance, 2009 Damages Tr. 454:8–455:14, JA897–898.
[57] Herrera, 2009 Damages Tr. 842:14–17, JA1106.

otherwise been activated for a while, Border Patrol agents will also enter Otay

Mesa's property to check on the sensor.[58]

The seismic intrusion sensors are placed by the United States Border Patrol

without Otay Mesa's knowledge, "at various underground locations on property in

the vicinity of the border for the purposes of apprehending persons attempting

illegal entry."[59]  The easement gives the Government the right to "change the

location of any sensor whenever it desires, and its agents must have the ability to

access the sensors at any time."[60]

## C.     The Government's concession of liability

On August 28, 2008, the Government conceded liability in the form of a

Stipulation for the taking of an easement over five of Otay Mesa's parcels,

admitting that "by virtue of its placement of the 14 sensors . . . it has taken a

property interest in the nature of an easement over the parcel of land on which the

sensors have been placed . . . ."[61]  The Government defined the nature and scope of

the easement it had taken over the five parcels as

> [a] perpetual and assignable easement to locate, construct, operate,
> maintain and repair or replace the specified underground seismic
> intrusion sensors on the specified parcels, including the right to

---

[58] Herrera, 2009 Damages Tr. 842:1–22, JA1106.
[59] Pls.' 2012 Damages Ex. 1 ¶3, JA1822; *see also* Hance, 2009 Damages Tr.
419:4–25, JA862.
[60] *Otay Mesa Property, L.P.*, 93 Fed. Cl. at 480.
[61] Pls.' 2012 Damages Ex. 1 ¶6, JA1823–1824.  This is an amended stipulation that
corrected two typos in the original August 28, 2008 stipulation.

ingress and egress to each sensor location. The easement shall be deemed to have commenced on the date the sensor is listed as having been installed, and will continue until the sensor is no longer needed or the property is developed. Each sensor is and shall be located so as to not affect the functionality of the property. Should the landowner desire to develop any portion of the subject parcel, the sensor will be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or a portion of the property. Upon removal of a sensor, the portion of the easement relating to that sensor shall terminate . . . .[62]

The trial court thus held that "Defendant is liable for the physical taking of an easement over parcels 1, 3, 4, 5, and 10 due to the installation and use of the seismic sensors."[63] The easement includes the right of ingress and egress over the entire surface of all 897 acres, on which the Border Patrol has the legal right to locate, construct, operate, maintain, and repair or replace sensors.[64]

As the trial court further noted, Otay Mesa did not participate in the drafting or review of the Stipulation prior to the Government's filing it. The Stipulation therefore is more accurately referred to as a unilateral concession of liability:

Defendant's "stipulation" was a unilateral concession of liability. Plaintiffs did not participate in the drafting or review of this document, and thus did not agree to its substance.[65]

---

[62] Pls.' 2012 Damages Ex. 1 ¶7, JA1824.

[63] *Otay Mesa Property, L.P.*, 86 Fed. Cl. at 791.

[64] Pls.' 2012 Damages Ex. 1 ¶7, JA1824 (taking "the right to ingress and egress to each sensor location").

[65] *Otay Mesa Property, L.P.*, 93 Fed. Cl. at 479 n.1.

As the trial court observed, under the Stipulation, the Government's right to access the property is unrestricted:  "The language of the stipulation thus places no limits on the Border Patrol's placement of its sensors on the five parcels, the movement of the sensors to other locations, or the manner in which the sensors are accessed."[66]  So although the Stipulation states that "upon removal of a sensor, the portion of the easement relating to that sensor shall terminate," the Stipulation is silent on how "the portion of the easement relating to that sensor" will terminate.[67]  Further, once a development permit is obtained for one location, the Stipulation provides that the Border Patrol can redeploy the seismic sensor intrusion sensor to another secret location—thus maintaining the integrity of the permanent, blanket easement.[68]

### D.     Effect of the easement on development of the property

Approximately 278 acres of the subject property is suitable for development, particularly parcels 1, 4, and 5.  But the Border Patrol's perpetual blanket easement for ingress, egress and operation of the sensors makes development more difficult and costly, as San Diego land use attorney Cynthia Eldred explained.[69]  In her opinion, obtaining discretionary project approvals will also be more difficult

---

[66]  *Otay Mesa Property, L.P.*, 93 Fed. Cl. at 486.

[67]  Pls.' 2012 Damages Ex. 1, JA1818–1826.

[68]  Pls.' 2012 Damages Ex 1 ¶¶ 4, 7, JA1822, JA1824; Carter, 2009 Damages Tr. 192:18–193:25, JA711–712.

[69]  Eldred, 2009 Damages Tr. 91:7–14, JA610.

because the Stipulation fails to identify who in the "United States"—as the permanent, blanket easement holder—the landowner must work with to obtain permits, subdivision approvals, and project financing.[70]  County Planning official Shick confirmed that he could not definitely state that, in the face of the Government's easement, the County would even issue Otay Mesa the grading permits necessary for development.[71]

### E. Otay Mesa has sold dozens of valuable easements on or near the subject property, demonstrating value

In spreadsheets introduced at trial, Otay Mesa listed dozens of easements Otay Mesa has sold to utilities on or near the subject property at prices from $58,000 and up.[72]  "[T]hese were easements for sewer lines, water lines, electrical lines, overhead, underground, slope easements for road and gas line easements,"[73] in which Otay Mesa retained use of the land surface.  Otay Mesa also sold to the Border Patrol for valuable consideration an easement 20′ feet wide to patrol the border,[74] and contracted to convey an easement to the Government for ingress and egress in return for which the Government would build a road valued at $1.7

---

[70] Eldred, 2009 Damages Tr. 94:24–95:16, JA613–614; Pls.' 2012 Damages Ex. 1 ¶7, JA1824.
[71] Shick, 2009 Damages Tr. 514:19–517:12, JA946–949.
[72] Pls.' 2009 Damages Ex. 266(pp), JA1633–1642; Pls.' 2009 Damages Ex. 266(yy), JA1643–1644.
[73] Wick, 2009 Damages Tr. 247:18–21, JA766.
[74] *Otay Mesa Property, L.P.*, 86 Fed. Cl. at 781; Def.'s Liability Ex. 521, JA1810–1816; Wick, 2009 Damages Tr. 258:15–259:14, JA777–778.

million.[75]

## Summary of the Argument

This Court previously reversed the trial court's holding that the blanket easement on the 897-acre subject property was temporary. The Court instructed the trial court to value the easement as a permanent, blanket easement on remand. But once again, the trial court has committed reversible error in two respects.

First, the trial court erred in failing to award Otay Mesa interest from the date of taking. Instead, the trial court calculated interest from the date the Government filed its unilateral concession of liability for the physical taking of the easement, August 29, 2008.[76] The trial court explained that—despite all precedent to the contrary—it chose this date because this filing date served as the date that Otay Mesa became aware of the taking.[77]

The trial court's conclusion is at sharp odds with the law, which requires that interest be awarded from the date of the taking, and the Government's concession of liability, which plainly states that the taking commenced on the date that the sensor was actually installed on the property: "The easement shall be deemed to

---

[75] Pls.' 2009 Damages Ex. 266(aaa), JA1614–1627; *International Industrial Park, Inc. v. United States*, 100 Fed. Cl. 638 (2011), *aff'd*, 496 Fed. Appx. 85 (Fed. Cir. 2013).

[76] *Otay Mesa Property, L.P.*, 111 Fed. Cl. at 424.

[77] *Id.*

have commenced on the date the sensor is listed as having been installed . . . ."[78]

In fact, the trial court itself correctly calculated interest from the date of taking in its first damages award.[79] The trial court was right then—and is wrong now as a matter of law.

Because interest compensates the property owner for delay in payment—the lapse between the Government's taking of property and the time the owner gets paid—there is no authority at all supporting the award of interest on a just compensation award running from any date other than the date of taking.[80] As the trial court recognized: "The Court acknowledges the existence of ample case law holding that interest in a Fifth Amendment taking should run from the date of the taking."[81] Commencing interest from the date of taking is based on a principle embedded in the Constitution itself, that when the Government takes property without paying, the Fifth Amendment does not limit just compensation to the value of the property at the time of the taking, but "entitle[s the property owner] to such addition as will produce the full equivalent of that value paid contemporaneously

---

[78] Pls.' 2012 Damages Ex. 1 ¶7, JA1824.

[79] *Otay Mesa Property, L.P.*, 93 Fed. Cl. at 491.

[80] *See, e.g.*, *Kirby Forest Indus. Inc.*, 467 U.S. at 10; *Jacobs*, 290 U.S. at 16–17; *Whitney Benefits, Inc.*, 30 Fed. Cl. at 413; *ITT Corp.*, 17 Cl. Ct. at 240; *see also* C.T. Drechsler, *Interest on damages for period before judgment for injury to, or detention, loss, or destruction of, property*, 36 A.L.R.2d 337 § 2[b]((8)) (collecting cases).

[81] *Otay Mesa Property, L.P.*, 111 Fed. Cl. at 423.

with the taking."[82]  In short, "interest is not awarded as such, but, rather, is considered to be a part of the 'compensation,'" guaranteed by the Fifth Amendment.[83]  That the trial judge failed to award interest from the date of taking, based on the date a sensor was first installed on each parcel is reversible error as a matter of law.

Finally, by determining the property's value at an early date stated in the concession of liability (ranging from April 1999 for Parcel 3 to October 2004 for Parcel 5), but denying interest for several years after the date of valuation, the trial court violated the fundamental principle that "identification of the time a taking of a tract of land occurs is crucial to determination of the amount of compensation to which the owner is constitutionally entitled."[84]  For the date of taking determines both the date of valuation and the date for commencement of interest; otherwise the owner is left—as here—with an early (generally lower) initial valuation followed by several years of no interest—a flat denial of just compensation.

The trial court was also clearly erroneous in valuing the 278-acre permanent easement burdening Otay Mesa's developable property at zero.  The trial court ruled in the first damages trial that this same easement, valued as temporary, had a

---

[82] S*eaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 306 (1923).
[83] *Dynamics Corp. of Am. v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985).
[84] *Kirby Forest Indus. Inc.*, 467 U.S. at 11.

market value of $3,043,051,[85] rejecting (as this Court did) the Government's

argument that Otay Mesa should receive only nominal damages:

> The government has argued that, because the sensor easement is permanent, the compensation due Otay Mesa is much less than the compensation that would be due if the easement were temporary. We find this argument difficult to accept. It does not seem to us logical that Otay Mesa should receive less compensation for the taking of a permanent easement than it would for the taking of a temporary easement.[86]

The trial court's ruling that Otay Mesa should receive nothing for the 278-

acre easement is also at odds with the uncontradicted evidence that Otay Mesa has

sold dozens of other easements on and near the subject property (including

easements sold to the Border Patrol) for substantial sums,[87] and the uncontradicted

testimony of expert witnesses for both sides that the easement makes development

of this property more difficult and costly.[88]  This evidence amply satisfied Otay

Mesa's burden of proving a reasonable approximation of the value of this

easement—and the law requires no more.[89]

Because the trial court's award violates the Fifth Amendment's guarantee of

just compensation, it should be reversed with instructions to make a reasonable

award for the 278-acre easement, including interest from the dates of taking of

---

[85] *Otay Mesa Property, L.P.*, 93 Fed. Cl. at 479.
[86] *Otay Mesa Property, L.P.*, 670 F.3d at 1368.
[87] Discussed *infra* section III.B.
[88] Discussed *infra* section III.C.
[89] Discussed *infra* section III.A.

each parcel as set forth in the Government's concession of liability.

**Argument**

## I.    Standard of Review

In reviewing a final decision of the CFC after a trial, this Court reviews legal conclusions de novo and factual findings under the clearly erroneous standard.[90]  In this case, the CFC's just compensation award rests on the court's conclusion of what interest is due based on its commencement date—the date that the Government's concession of liability was filed—as opposed to the date of taking.  The date for determining when interest should commence is a legal question, subject to plenary review.[91]  "Conclusions of law . . . are 'subject to full and independent review,' without deference to the trial court."[92]

The CFC's determination that the permanent, blanket easement on the developable land has zero value is a question of fact and is reviewed under the clearly erroneous standard.[93]  "A finding is 'clearly erroneous' when although there

---

[90] *American Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004).

[91] *Coast Indian Community v. United States*, 213 Ct. Cl. 129, 134 (1977) (describing the question of what interest is due on an award of just compensation as one of three "questions of law . . . .").

[92] *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1378 (Fed. Cir. 2001).

[93] *See Toronto, Hamilton &Buffalo Nav. Co. v. United States*, 116 Ct. Cl. 184, 207 (1950).

is evidence to support it, the reviewing court on the entire evidence is left with the

definite and firm conviction that a mistake has been committed."[94]

## II. The trial court refused to award interest from the date of the taking, and the damages award thus fell short of the Fifth Amendment's just compensation requirement

That the Fifth Amendment's just compensation clause requires an award of

interest from the date of taking to the date of payment by the Government is

incontrovertible:

> [I]n such cases it has consistently been held that the Fifth Amendment's reference to just compensation entitles the property owner to receive interest from the date of the taking to the date of payment as a part of his just compensation. *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 306; *Brooks-Scanlon Corporation v. United States*, 265 U.S. 106, 123; *Phelps v. United States,* 274 U.S. 341.[95]

The Supreme Court has characterized a denial of interest from the date of taking as

inadequate compensation:

> The amount recoverable was just compensation, not inadequate compensation . . . . The owner is not limited to the value of the property at the time of the taking; "he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking." Interest at a proper rate "is a good measure by which to ascertain the amount so to be added.[96]

This Court too has uniformly approved just compensation from the date of

---

[94] *Am. Pelagic Fishing Co., L.P.*, 379 F.3d at 1371.

[95] *Thayer-West Point Hotel Co.*, 329 U.S. at 588 (parallel citations omitted); *see also Whitney Benefits, Inc.*, 30 Fed. Cl. at 413.

[96] *Jacobs*, 290 U.S. at 16–17.

taking until payment in inverse condemnation cases.[97]  This Court's predecessor, the Court of Claims, has held the same in *Miller v. United States*,[98] explaining that paying interest from the date of taking is a constitutional requirement:

> It is constitutionally required that plaintiffs must receive an amount sufficient to produce the full equivalent of the value paid contemporaneously with the taking. Conversely, the benefit accruing to defendant through the delay in payment should be approximately cancelled by the additional amount payable because of the delay.  The imposition of a fair rate of interest on defendant as part of an award of just compensation should not be viewed as a penalty for a wrongful delay of payment.  Defendant is required to compensate condemnees for even reasonable delays in payment such as the delay caused if an appraisal is necessary after the taking for defendant to make a fair offer of payment.  On the other hand, the award of less than a fair rate of interest to plaintiffs must be viewed as an impermissible interference with the exercise of their right to a judicial determination of the amount of just compensation.[99]

Sitting en banc in *Sioux Nation of Indians v. United States*,[100] the Court of Claims also stated: "The sole question before us is whether that acquisition constituted a taking in violation of the fifth amendment.  The significance of that issue is that if it were such a taking, the government would be liable not only for the value of the property taken but also for interest from the date of taking."[101]

Until this case, the Court of Federal Claims has uniformly awarded interest

---

[97] *Whitney Benefits v. United States*, 926 F.2d 1169, 1177 (Fed. Cir. 1991).
[98] *Miller v. United States*, 223 Ct. Cl. 352 (1980).
[99] *Miller*, 223 Ct. Cl. at 403–404 (citations omitted).
[100] *Sioux Nation of Indians v. United States*, 220 Ct. Cl. 442 (1979).
[101] *Id.* at 446; *see also King v. United States*, 205 Ct. Cl. 512, 519 (1974) ("Plaintiffs are entitled to interest from September 14, 1961, the defendant's selection as the date of taking, as a part of just compensation.").

in inverse condemnation cases from the date of taking.  In *Vaizburd v. United States*,[102] for instance, the court awarded "compound interest pursuant to 40 U.S.C. § 3116, from December 31, 1995, the date of taking, to the date of payment."[103] Likewise, in *Moore v. United States*,[104] the court awarded "interest from the date of taking."[105]  In *Whitney Benefits v. United States*,[106] the court stated that "interest [is] to accrue from the date of the taking, August 3, 1977, until the date of payment."[107]  The court also awarded just compensation "plus interest from the date of taking" in *Tulare Lake Basin Water Storage District v. United States*.[108]  In *NRG Co. v. United States*,[109] the court awarded compound interest from "the date of appropriation to the date of payment."[110]  In *Heydt v. United States*,[111] the CFC held that interest accrued on the date of taking, and collected several cases in which the rule was applied:

> In addition, an award of just compensation for the temporary taking of property also entitles the owner to interest from the date of the taking to the date of compensation.  *Shelden*, 34 Fed. Cl. at 377–78; *Yaist*, 17 Cl. Ct. at 261–62; *Economic Dev. & Indus. Corp. of Boston*, 13 Cl. Ct.

---

[102] *Vaizburd v. United States*, 67 Fed. Cl. 499 (2005).

[103] *Id.* at 504.

[104] *Moore v. United States*, 61 Fed. Cl. 73 (2004).

[105] *Id.* at 84.

[106] *Whitney Benefits*, 30 Fed. Cl. 411 (1994).

[107] *Id.* at 416.

[108] *Tulare Lake Basin Water Storage District v. United States*, 59 Fed. Cl. 246, 266 (2003).

[109] *NRG Co. v. United States*, 31 Fed. Cl. 659 (1994)

[110] *Id.* at 670.

[111] *Heydt v. United States*, 38 Fed. Cl. 286 (1997).

at 604; *Foster v. United States*, 3 Cl. Ct. 738, 744–45 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir.1984) . . . .[112]

Further, all of the cases (state and federal) cited in the American Law Reports's annotation on this point hold that interest must be paid from the date of taking to provide just compensation:

> As to the time from which interest is to be computed, all the cases agree that interest, or damages for delay, to which the owner of property is entitled in case payment of compensation does not accompany the taking of his property for public use, will be computed from the time of the taking . . . .[113]

There is also sound policy underlying the rule that interest on a takings judgment must be paid from the date of taking, namely that a dollar today is simply worth more than a dollar paid in later years:

> Whatever may have been our archaic notions about interest, in modern financial communities a dollar to-day is worth more than a dollar next year, and to ignore the interval as immaterial is to contradict well-settled beliefs about value. The present use of my money is itself a thing of value, and, if I get no compensation for its loss, my remedy does not altogether right my wrong.[114]

Finally, the trial court in its first damages opinion itself awarded Otay Mesa interest from the date of taking (commencing in April 1999) until the Government paid the original damages determination, as required by the Fifth Amendment:

---

[112] *Heydt v. United States*, 38 Fed. Cl. at 314.

[113] C.T. Drechsler, *Interest on damages for period before judgment for injury to, or detention, loss, or destruction of, property*, 36 A.L.R.2d 337 § 2[b]((8)).

[114] *Procter & Gamble Distrib. Co. v. Sherman*, 2 F.2d 165, 166 (S.D.N.Y. 1924) (J. L. Hand); *see also Whitney Benefits, Inc. v. United States*, 18 Cl. Ct. 394, 416 (1989).

Plaintiffs must be compensated not only for the value of the Government's easement over its property but also for any delay in the Government's payment of that amount. See NRG Co. v. United States, 31 Fed. Cl. 659, 664 (1994). Again, the purpose of just compensation is to "insure that [the property owner] is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984).

. . .

[T]he Court awards Plaintiffs compounded interest for the period of the taking (April 1999 to October 2008) with the interest computation to be based on the CDA. [115]

The Government did not appeal this interest award.

But on remand, the trial court reversed position and refused to award interest from the date of taking. Denying Otay Mesa's motion for reconsideration,[116] the trial court acknowledged that precedent uniformly requires interest be paid from the date of taking:

The Court acknowledges the existence of ample case law holding that interest in a Fifth Amendment taking should run from the date of the taking. *See, e.g., Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (owner is entitled to interest so he is placed in as good a position as he would have occupied if payment had coincided with the taking); *Jacobs v. United States,* 290 U.S. 13, 16–17, 54 S.Ct. 26, 78 L.Ed. 142 (1933) (owner is entitled to interest to produce the equivalent of the value if paid at the time of the taking). This principle recognizes the time value of money and the opportunity a plaintiff has lost to earn income on its damages award. *Whitney Benefits, Inc. v. United States,* 30 Fed.Cl. 411, 413 (1994). A delay in payment is also a delay in the use of the money. *ITT Corp. v. United States,* 17 Cl. Ct. 199, 240 (1989).[117]

---

[115] *Otay Mesa Property, L.P.*, 93 Fed. Cl. at 491.
[116] Pls.' Mot. for Reconsideration, Doc. 270 (June 10, 2013).
[117] *Otay Mesa Prop., L.P.*, 111 Fed. Cl. at 423–424.

In its decision denying reconsideration, the trial court finally offered this explanation for why interest was calculated from the date the Stipulation was filed:

> The Government first divulged the existence of the sensors to Plaintiffs through the filing of the stipulation on August 28, 2008. Before that date, only the Government knew that the sensors were in use on Plaintiffs' property. If no person or entity outside of the Government was aware of the sensors until the disclosure date in 2008, the risk on which the Court's damages award is based did not exist until 2008.[118]

But use of the date of filing of the Stipulation as the date for calculating interest is reversible as a matter of law. By ignoring the date of taking as the starting date for accumulation of interest the trial court violated the fundamental principle that "identification of the time a taking of a tract of land occurs is crucial to determination of the amount of compensation to which the owner is constitutionally entitled."[119] This is because:

> [T]he Fifth Amendment does not forbid the Government to take land and pay for it later. But if disbursement of the award is delayed, the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.[120]

There is no question in this case as to what dates the trial court should have calculated interest from. The dates of taking are fixed by the Government's admission that it was the placement of the sensors that constituted the taking:

---

[118] *Otay Mesa Prop., L.P.*, 111 Fed. Cl. at 424.
[119] *Kirby Forest Indus., Inc.*, 467 U.S. at 11.
[120] *Id.* at 10.

> Defendant hereby stipulates that, by virtue of its placement of the 14 sensors specified above on the listed parcels of land, it has taken a property interest in the nature of an easement over the parcel of land on which the sensors have been placed.[121]

The Government further provided the dates of installation of each sensor in the Stipulation,[122] and both parties agreed at trial that the dates given by the Government for the installation of the first sensor on each of the five parcels were the correct dates of taking.[123]  Those dates are:[124]

| Parcel | Date of taking |
|--------|----------------|
| 1 | August 2003 |
| 3 | April 1999 |
| 4 | August 2003 |
| 5 | October 2004 |
| 10 | September 2004 |

But in violation of the Fifth Amendment's just compensation guarantee, the trial court's judgment does not place Otay Mesa "in as good a position pecuniarily as [it] would have occupied if the payment had coincided with the appropriation."[125]  Instead, the judgment truncates the just compensation award, by allowing interest only from August 2008 (when the Government finally admitted liability for the taking).  As a result, the Government thus has obtained the

---

[121] Pls.' 2012 Damages Ex. 1 at ¶6, JA1823–1824.  The stipulation included a table with each sensor's numerical designation, location, and the date the Government installed the sensor.

[122] Pls.' 2012 Damages Ex. 1, JA1818–1826.

[123] *See* Tagg, 2012 Damages Tr. 57:23–58:6, JA1186–1187; Roach, 2012 Damages Tr. 332:1–9, JA1462.

[124] Pls.' 2012 Damages Ex. 1 ¶5, JA1823.

[125] *Kirby Forest Indus., Inc.*, 467 U.S. at 10.

easement at lower prices interest-free for up to nine years (1999–2008).

Finally, by separating the date of valuation (date of taking) from the date interest commences, the trial court violated the fundamental principle that "identification of the time a taking of a tract of land occurs is crucial to determination of the amount of compensation to which the owner is constitutionally entitled."[126] If Otay Mesa is to be denied interest until August 2008, then that must be the date of valuation as well. To value the property at an earlier date (1999 through 2004) but deny interest from that date is to deny Fifth Amendment just compensation.[127]

Because the trial court's refusal to award interest from the date of taking falls short of the just compensation guarantee of the Fifth Amendment, the judgment must be reversed with instructions to enter judgment for interest from the date of the taking until paid.

## III. The trial court's determination that the easement burdening 278 acres of Otay Mesa's developable property had no value at all is clearly erroneous

The fundamental guarantee of the Fifth Amendment is that the property owner will receive just compensation for property taken:

> In relevant part, the Fifth Amendment requires that the United States pay "just compensation" whenever it takes private property for public use. U.S.

---

[126] *Kirby Forest Indus., Inc.*, 467 U.S. at 11.
[127] *Id.*

31

Const. amend. V ("[N]or shall private property be taken for public use, without just compensation.").[128]

The trial court's failure to award Otay Mesa any just compensation at all for the Government's taking of an easement allowing the Border Patrol ingress, egress, and the right to operate seismic intrusion sensors on 278 acres of Otay Mesa's property falls short of this constitutional guarantee of just compensation. Therefore, the trial court's ruling is clearly erroneous.

On remand, Otay Mesa met its burden of proving a reasonable approximation of its damages on the developable lands by introducing evidence of:

- The substantial amounts paid by utility companies and the Border Patrol itself for the purchase of numerous easements over Otay Mesa's property;

- The additional time, cost, and work required to deal with the Border Patrol's easement during San Diego County's development process;

- The substantial fee value of the 278 acres—$14,547,800.

The trial judge's determination that the permanent easement burdening the 278 acres of developable land has no value is irreconcilable with his previous determination that the easement had substantial value ($726,831).  Although this Court reversed the damages calculation on appeal because it valued a temporary, and not a permanent, easement, there is nothing in the prior appellate opinion to suggest the value could ever be zero where, as here, the landowner offered

---

[128] *Otay Mesa Property, L.P.*, 670 F.3d at 1361 n.2.

unrebutted evidence of other valuation criteria supporting a substantial value for the property taken. Awarding no just compensation for the taking of this easement also runs afoul of this Court's rejection in the prior appeal of the Government's argument that "Otay Mesa is entitled to only a nominal award":

> We find this argument difficult to accept. It does not seem to us logical that Otay Mesa should receive less compensation for the taking of a permanent easement than it would for the taking of a temporary easement.[129]

Notable, too, is rarely, if ever, has a court found a property interest taken by condemnation to be completely valueless.[130] Some have even questioned whether a taking of property that has absolutely no value even triggers the Fifth Amendment's guarantee of just compensation.

### A. Otay Mesa met its burden to prove a reasonable approximation of its damages

The Government has admitted liability for the taking of an easement, which is "[a]n interest in land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose (such

---

[129] *Otay Mesa Property, L.P.*, 670 F.3d at 1368.

[130] *See, e.g.*, *United States v. 117,763.00 Acres of Land in Imperial Cnty., California*, 410 F. Supp. 628, 632 (S.D. Cal. 1976) (awarding just compensation despite there being no market value for the property); *St. Genevieve Gas Co., Inc. v. Tennessee Valley Auth.*, 747 F.2d 1411, 1414 (11th Cir. 1984) (awarding compensation for mineral leases that had been fully "drilled out," and "the leases ha[d] no commercial value").

as to cross it for access to a public road)."[131]  The Fifth Amendment requires that

the taking of such an interest in land be justly compensated:  "It is well established

that the government may not take an easement without just compensation."[132]

As this Court has repeatedly held, to recover just compensation, Otay Mesa

is not required to prove the precise amount of just compensation due, but only a

fair and reasonable approximation:

> The principle that damages must be shown to a reasonable certainty, which is borrowed from the law of contract remedies, is not incompatible with the rule that a plaintiff need not prove the precise amount of damages; both principles require that the quantum of damages be shown to a reasonable approximation. *See Ind. Mich. Power Co. v. United States,* 422 F.3d 1369, 1373 (Fed. Cir.2005) (damages must be shown "with reasonable certainty," but "the amount of damages need not be 'ascertainable with absolute exactness or mathematical precision' "); *Precision Pine & Timber Co. v. United States,* 596 F.3d 817, 833 (Fed. Cir.2010) (evidence must be sufficient to enable finder of fact to make a "fair and reasonable approximation" of damages; that is, a party seeking damages must prove them with "reasonable certainty," which "requires more than a guess, but less than absolute exactness"); *Huntley v. United States,* 133 Ct. Cl. 226, 135 F.Supp. 542, 546 (Ct. Cl.1955) ("All that is required is such reasonable certainty that damages may not be based wholly upon speculation," and "may be estimated with a fair degree of accuracy.").[133]

This Court's predecessor has also recognized that the concept of just

---

[131] BLACK'S LAW DICTIONARY 585–586 (9th ed. 2009).

[132] *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1352 (Fed. Cir. 2003).

[133] *Ark. Game & Fish Comm'n v. United States*, 2013 WL 6231552 at *11 (Fed. Cir. Dec. 3, 2013).

compensation cannot be "reduced to a formula" or to "inexorable rules";[134] and the

Supreme Court has stated that, in the final analysis, valuation is generally a matter

of judgment.[135]  So too, as this Court instructed in remanding this case for

determination of damages, just compensation must be tailored to the particular

circumstances:

> In our view, this case aptly demonstrates that "just compensation" should be carefully tailored to the circumstances of each particular case.   *See Kimball Laundry*, 338 U.S. at 20 (explaining that "computation of the compensation due" should be consistent "with an approach which seeks with the aid of all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken").[136]

When the record has not contained the information needed for a precise

determination of damages, this Court's predecessor has resorted to a damages

determination in the nature of a jury verdict form of valuation:

> The Court of Claims recognized in a number of cases that it is sometimes necessary to resort to a determination in the nature of a jury verdict in order to decide the question of valuation or damages in a case where the record does not contain the data needed for a precise determination: *e.g., Aaron v. United States,* 167 Ct. Cl. 818, 826, 340 F.2d 655, 660 (1964); *Clemens Construction Co. v. United States,* 160 Ct. Cl. 675, 679 (1963); *Dee Hong Lue v. United States,* 150 Ct. Cl. 655, 667, 280 F.2d 849, 856 (1960).[137]

As one commentator has further noted, determining the value of an easement

---

[134] *Miller*, 223 Ct. Cl. at 377.

[135] *United States v. Miller*, 317 U.S. 369, 375 (1943).

[136] *Otay Mesa Property, L.P.*, 670 F.3d at 1368.

[137] *Branning v. United States*, 6 Cl. Ct. 618, 629 (1984).

using the before-and-after method, as here, is difficult and often leads to the

erroneous conclusion (as reached by the trial judge in this case) that the

compensation due is zero or nominal:

> While the appraisal of real estate in general has been described as an inexact science, the application of the "before and after" test to a particular easement is an especially difficult task for an appraiser. There are several approaches to this test, each varying in degree of practicability.
>
> . . .
>
> These techniques frequently enable the appraiser to say only that the difference in the before and after values of the property is not measurable or, more affirmatively, that there is no difference. Such a conclusion is intuitively unsatisfactory. The condemnor values the easement highly enough to attempt to negotiate its acquisition and, if necessary, to commence judicial proceedings. At the same time, however, the compensation indicated by appraisal is zero or nominal.[138]

Here, both the Government's and Otay Mesa's appraisers conceded that they

were unable to find sales of easements comparable to this one.[139]  The trial court

should then have used the other available evidence to determine just compensation:

> Where comparable sales data is lacking, the court will use other evidence, even though somewhat uncertain, as long as it is premised on a reasonably informed basis. *Foster v. United States,* 2 Cl. Ct. at 477 [sic] (citing *United States v. Miller,* 317 U.S. 369 at 374-75, 63 S.Ct. 276 at 280, 87 L.Ed. 336). Although such an estimation may call for some conjecture, this will not cause the evaluation to fail. *United States v. 22.80 Acres,* 839 F.2d at 1365 (citing *United States v. Silver Queen Mining Co.,* 285 F.2d 506, 510 (10th Cir. 1960)).[140]

---

[138] Ronald L. Baird, *Easement Condemnation and* State v. Doyle*: Fair Market Value Without a Market*, 6 ALASKA L. REV. 199, 208, 212 (Dec. 1989).

[139] Tagg, Tr. 85:22–86:8, JA1214–1215; Roach, Tr. 410:8–12, JA1540.

[140] *Yaist v. United States*, 17 Cl. Ct. 246, 257–258 (1989).

**B.** **The trial court improperly ignored the evidence that sophisticated parties—including the Border Patrol—had paid substantial amounts for easements over Otay Mesa's property**

The trial court's finding that the 278-acre easement burdening Otay Mesa's developable property had no value at all is flatly contradicted by the unchallenged fact that sophisticated parties—particularly utility companies and the Border Patrol itself—have paid large sums for easements over the subject property and nearby land owned by Otay Mesa. The trial court made no factual findings at all regarding these comparable sales. At trial on remand, Otay Mesa introduced evidence of dozens of easements it had granted to various parties over its property, and the amount paid for each. Although these were not sensor easements (a unique governmental use for which neither party could find any comparable sales), the substantial value paid for these easements—many of which allowed for comparable ingress and egress and were also "minimally invasive"—proves, at a minimum, that there is a substantial fair market value for easements on this property.

Otay Mesa introduced evidence, for instance, that it has granted non-exclusive easements to utilities for transmission lines (which still allow Otay Mesa the surface use of the land) including:

37

| Easement | Price per Acre[141] |
|---|---|
| Agreement Concerning Electric and Gas/Transmission Line Right of Way (Otay Mesa Generating Company, LLC) | $66,000 |
| Alta Road Transmission Line (Otay Mesa Generating Company, LLC) | $58,566 |
| Alta Road Transmission Line (Otay Mesa Generating Company, LLC) | $58,564 |
| Agreement Concerning Electric and Gas Transmission Line Right of Way (Otay Mesa Generating Company, LLC) | $77,441 |
| Agreement Concerning Electric and Gas Transmission Line Right of Way (Otay Mesa Generating Company, LLC) | $66,873 |
| Easement Concerning Electric and Gas Transmission Line Right of Way (San Diego Gas & Electric Company) | $63,158 |

These and other similar easements Otay Mesa sold on the subject and nearby property are shown on two spreadsheets[142] prepared for the trial by Otay's General Manager, Wick, who testified:

> [T]hese were easements for sewer lines, water lines, electrical lines, overhead, underground, slope easements for road and gas line

---

[141] The sale prices for easements to the Otay Mesa Generating Company, LLC are from Pls.' 2009 Damages Ex. 266(yy), JA1643–1644 and the sale prices for easements to the San Diego Gas & Electric Company are from Pls.' 2009 Damages Ex. 266(pp), JA1633–1642.

[142] Pls.' 2009 Damages Ex. 266(pp), JA1633–1642; Pls.' 2009 Damages Ex. 266(yy), JA1643–1644.

38

easements bringing natural gas to the site. The total acreage if you add that up, and I didn't add it up here but I did before I got up here on the stand, it's 23 permanent acres and 12.7 temporary acres. You can see the prices there, price per acre, which is the third column from the right, and if you scan that it has a low of $58,000 per acre and a high of $5.3 million per acre. Again, these are easement sales, so this is a little different from the leases we've talked about. These are actual easement sales. The map just behind the spreadsheet that's in color shows the different easements that were sold, and it shows the location of those easements there to give you an understanding.[143]

Otay Mesa also introduced an easement sale of approximately 1.4 acres for overhead power lines on parcel 9 that it sold to San Diego Gas & Electric in 2007.[144] The sale price was $680,000—or about $492,000 per acre. Under the easement Otay Mesa "can still park cars, we can still use the underground access, but we've given up the air rights . . . ."[145] Otay Mesa also sold a 1.9-acre easement to the same utility company for an underground gas transmission line—reserving the right to use the surface—for about $63,000 per acre.[146]

Otay Mesa has also sold easements to the Border Patrol itself. In 2008 Otay Mesa and the Border Patrol entered into an agreement by which Otay Mesa would grant the Border Patrol an easement over 6.3 acres for ingress and egress,[147] in exchange for which the Government would construct a paved road costing $1.7

---

[143] Wick, 2009 Damages Tr. 247:18–248:9, JA766–767.

[144] Pls.' 2009 Damages Ex. 266(ddd), JA1628–1632.

[145] Wick, 2009 Damages Tr. 252:1–3, JA771.

[146] Pls.' 2009 Damages Ex. 266(pp), JA1633–1642.

[147] Pls.' 2009 Damages Ex. 266(aaa), JA1614–1627.

million.[148]  In 1992, Otay Mesa granted to the Border Patrol a one-year easement 20′ feet wide along the Mexican border for patrol purposes, which was renewed several times.[149]  The Border Patrol paid $1,000 per year for this easement, which encumbered about one acre.[150]

In determining just compensation the trial court was required to take into account "all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken."[151]  Yet the trial court failed to make any findings (or even to mention) this substantial and probative evidence of easement sales.  Ignoring this highly relevant evidence was error as a matter of law, leading the trial court to its clearly erroneous conclusion that Otay Mesa was entitled to no compensation for the taking of the easement on 278 acres of developable land.

## C.  By imposing additional uncertainties and costs of development the easement decreases the value of Otay Mesa's 278 acres of developable property

The trial court's conclusion that the 278-acre easement on Otay Mesa's developable property has no value at all ignores the real-world impact of the easement on the development process.  A land developer presented with two

---

[148] *International Industrial Park, Inc. v. United States*, 100 Fed. Cl. 638 (2011), *aff'd*, 496 Fed. App'x 85 (Fed. Cir. 2013).

[149] *Otay Mesa Property, L.P.*, 86 Fed. Cl. at 781.

[150] Def.'s Liability Ex. 521, JA1810–1816; Wick, 2009 Damages Tr. 258:15–259:14, JA777–778.

[151] *Kimball Laundry Co. v. United States*, 338 U.S. 1, 20 (1949).

identical parcels of property, one encumbered by the Border Patrol easement and the other free of such easement, would logically choose the unencumbered property. This is because, as San Diego land use attorney Cynthia Eldred testified, the mere existence of the easement "will increase the difficulty, time and cost in obtaining discretionary project approvals"[152] such as site plans, grading and building permits, minor and major use permits or zoning classifications.[153] "[O]ften what the applicant does is apply for multiple discretionary permits at the same time . . . ."[154] The existence of an easement negatively affects the owner's ability to get discretionary project approvals because "it's going to make the process, any easement, incrementally more difficult, more time consuming and more costly."[155]

Eldred also testified that San Diego County requires the applicant to disclose all easements on the property: "The County of San Diego has the engineer of record certify that the engineer's included in all maps and plans all public and private recorded and unrecorded easements"[156] The landowner must also provide a title report listing "all encumbrances on the property, whether they be beneficial or negative, such as easements, agreements, memorandums of lease of options to

---

[152] Eldred, 2009 Damages Tr. 91:12–14, JA610; *see also* Pls.' 2012 Damages Ex. 1, Stipulation ¶7, JA1824.
[153] Eldred, 2009 Damages Tr. 58:14–18, JA577.
[154] Eldred, 2009 Damages Tr. 61:8–10, JA580.
[155] Eldred, 2009 Damages Tr. 66:21–23, JA585.
[156] Eldred, 2009 Damages Tr. 75:2–5, JA594.

purchase, and so on."[157]

When land is subdivided, "the county requires that all easement holders be identified and that their permission be given for any encroachments onto their easement interest."[158] That permission may be provided in two ways: "[T]hrough a joint use agreement between the existing easement holder and the proposed new easement holder. The other way is for the existing easement holder to enter in a subordination agreement which would subordinate its senior in time rights to the new easement."[159]

Eldred testified that in her expert opinion the Government's easement in this case "will increase the difficulty, time and cost in obtaining discretionary project approvals."[160] This is because

> with every discretionary project approval for this property, however many that might be, then the land owner is going to have to resolve issues that arise in the minds of various members of the county staff, and perhaps Fish & Wildlife and Fish & Game, as to whether or not the proposed development is consistent with this easement, and that alone will cost the land owner.[161]

In addition,

> there is no one with authority identified within the terms of the easement to whom I and the county can look to say is it okay with you if we go forward with this project? Do we understand correctly that

---

[157] Eldred, 2009 Damages Tr. 75:11–14, JA594.
[158] Eldred, 2009 Damages Tr. 80:5–7, JA599.
[159] Eldred, 2009 Damages Tr. 80:10–15, JA599.
[160] Eldred, 2009 Damages Tr. 91:12–14, JA610.
[161] Eldred, 2009 Damages Tr. 92:22–93:4, JA611–612.

when the County of San Diego issues a grading permit that you will terminate the easement, and how are we going to know that at the end of the day? Will you subordinate today? Will you enter into a joint use agreement today? Will you define today by a legal description the portion of the property that you're going to remove from the easement? All of that takes substantial time and money, and remember, the land owner is paying not only for the time of its lawyer and consultants, but for every minute that everybody, including county counsel, uses in touching this easement.[162]

David Wick, Otay Mesa's General Manager, testified that getting the easement holder's permission was "the most difficult aspect" of obtaining a grading permit from the County on parcel 11:

[T]he county required us to obtain permission from each and every encumbrance and easement holder that that project had shown in a title report or any disclosure we've made to the county as to parties who had an interest in that property. One of those parties was San Diego Gas & Electric that had an overhead power line easement. Until we obtained San Diego Gas & Electric's consent to our grading plan, the county would not issue our grading permit.[163]

Because the County requires the landowner to pay by the hour for the time County employees spend on each discretionary permit application, "the land owner is paying every time each person at the County of San Diego picks up a piece of paper and looks at it, so you're talking about an increased consumption of time by multiple staff members . . . ."[164]

Richard Shick, called by the Government as an expert in the impact that the

---

[162] Eldred, 2009 Damages Tr. 93:12–94:3, JA612–613.
[163] Wick, 2009 Damages Tr. 237:25–238:9, JA756–757.
[164] Eldred, 2009 Damages Tr. 66:24–67:3, JA585–586.

amended stipulation as to liability may have on this permitting process, confirmed

Eldred's testimony:

> [T]he applicant submits a written application, submits engineer plans
> prepared by civil engineers.  They go through a pre-screening process
> with the department.  We identify the necessary resources that will be
> involved in the review of the plans.  After we are through with the
> prescreening, which is just more of a cursory review, it goes back to
> the engineer.  The engineer will then submit a formal set of plans with
> all the copies necessary for the resources along with reports, studies
> and any other information that's pertinent to the issuance of a grading
> permit, and then it goes through a series of iterations for review by
> staff and our resources, and through that iteration process, the
> engineer is addressing our comments, and eventually we get to the
> point where we're satisfied that they met all the requirements, and we
> approve the plans and issue the permit.[165]

Schick testified that the easement described in the stipulation would require

addition of an advisory note on the permit plans requiring Otay Mesa to notify the

United States within 30 days:

> Based on the stipulation and discussions I've had with yourself, Mr.
> Larson, I think that the issuance of a grading permit, it may result in
> an advisory note on the plans advising the applicant that they would
> have to notify the United States within 30 days upon issuance of the
> permit.[166]

Schick further testified that he could not definitely state that, in the face of

the Government's easement, the County would even issue the grading permit:

> Q.    Okay.  Now, in this case though, Mr. Shick, I understand your
>       testimony to be that you can say to a certainty that the county
>       would in fact not require the consent of the Border Patrol and

---

[165] Shick, 2009 Damages Tr. 487:24–488:17, JA919–920.
[166] Shick, 2009 Damages 494:17–22, JA926.

would only put a note, an advisory note, on the grading permit,
but that you'd definitely issue it. Is that your testimony?

A.     No.[167]

Rather, Shick admitted that if this easement (which provides for ingress and

egress by the Border Patrol) appeared to be in conflict with a grading plan (which

might block the Border Patrol's access to a sensor), the County would typically

require a letter of approval from the easement-holder (here, the Government):

Q.     Okay. And if you see a conflict between the easement shown
on the plans and the grading permit requested, what do you do?

A.     Typically, we require a letter of permission from the easement
holder.[168]

---

[167] Shick, 2009 Damages Tr. 517:2–9, JA949.
[168] Shick, 2009 Damages Tr. 514:19–515:23, JA946–947.

**Conclusion**

For all of these reasons, Otay Mesa asks this Court to affirm the trial court's damages award as to the mitigation land, and reverse and remand only as to the zero award for the developable land, and to remand this case to the trial court with instructions for a new damages determination that affords Otay Mesa just compensation as guaranteed by the Fifth Amendment for the taking of a permanent, blanket easement on its developable property, with interest calculated from the date of taking.

Respectfully submitted,

 s/  Roger J. Marzulla
Roger J. Marzulla
Nancie G. Marzulla
MARZULLA LAW, LLC
1150 Connecticut Avenue, NW
Suite 1050
Washington, DC 20036
(202) 822-6760 (telephone)
(202) 822-6774 (facsimile)
Roger@Marzulla.com
Nancie@Marzulla.com

December 9, 2013                    Counsel for Plaintiffs-Appellants

CASE PARTICIPANTS ONLY

# ADDENDUM

# In the United States Court of Federal Claims

No. 06-167L (and consolidated cases)

(Filed: May 30, 2013)

```
*************************************
                                    *
OTAY MESA PROPERTY, L.P., et al.,   *
                                    *
                                    *
                 Plaintiffs,        *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
                 Defendant.         *
                                    *
*************************************
```

Fifth Amendment Taking; U.S. Border Patrol's Use of Seismic Intrusion Sensors on Plaintiffs' Property; Risk to Plaintiffs that Property Could Not Be Used for Mitigation Purposes Under California Land Use Law; Fair and Reasonable Determination of Damages.

*Roger J. Marzulla*, with whom was *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, D.C., for Plaintiffs.

*Lary C. Larson*, with whom were *Ignacia S. Moreno*, Assistant Attorney General, and *Joshua A. Doan*, Trial Attorney, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., *Michael Felts*, Senior Attorney, United States Customs and Border Protection, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This case is before the Court on remand from the United States Court of Appeals for the Federal Circuit to determine the proper amount of damages due Plaintiffs Otay Mesa Property, LP, Rancho Vista Del Mar, Otay International, LLC, OMC Property, LLC, D&D Landholdings, LP, and International Industrial Park, Inc. See Otay Mesa Prop., L.P. v. United States, 670 F.3d 1358, 1360 (Fed. Cir. 2012). The factual background and history of this case are found in the Court's previous opinions. See Otay Mesa Prop., L.P. v. United States, 93 Fed. Cl. 476, 479-84 (2010) ("Damages Decision"); Otay Mesa Prop., L.P. v. United States, 86 Fed. Cl. 774, 775-85 (2009) ("Liability Decision"). The Court will provide a brief overview of the facts relevant to the issues currently on remand.

Plaintiffs own eleven contiguous parcels of largely undeveloped land in San Diego County, California near the United States' border with Mexico. The land is subject to an easement taken by the United States Border Patrol to allow for the placement of seismic intrusion sensors on the property. In proceedings leading up to the trial in the liability phase, Government counsel drafted and filed this easement on October 16, 2008, conceding liability for a Fifth Amendment taking. The easement is styled as a "stipulation," but Plaintiffs played no role in drafting or assenting to the terms of this document. Plaintiffs did not receive any compensation in return for the Government's taking of the easement.

According to the October 16, 2008 document, the Government holds "[a] perpetual and assignable easement to locate, construct, operate, maintain and repair or replace the specified underground seismic intrusion sensors on the specified parcels, including the right to ingress and egress to each sensor location." PX 1 at ¶ 7. The document lists fourteen seismic intrusion sensors at various underground locations on parcels 1, 3, 4, 5, and 10 of Plaintiffs' property, and states the month of installation for each sensor. Id. at ¶ 5; see Liability Decision, 86 Fed. Cl. at 777. The Government states that in placing these sensors on the five parcels of land, "it has taken a property interest in the nature of an easement over the parcel of land on which the sensors have been placed." PX 1 at ¶ 6. The Government also states that the easement "will continue until the sensor is no longer needed or the property is developed[,]" in which case "the sensor will be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or a portion of the property." Id. at ¶ 7. Regarding termination, the document states that "upon removal of a sensor, the portion of the easement relating to that sensor shall terminate." Id. The sensors are approximately one cubic foot in size, and upon being buried in the ground, a one-foot long antenna extends above the ground for each sensor. Id. at ¶ 3.

Based upon the Government's concession, this Court held that the Government was liable for the physical taking of an easement over the five parcels for the purpose of installing and operating the sensors. Liability Decision, 86 Fed. Cl. at 790. In the subsequent decision on damages, the Court held that the Border Patrol had taken a temporary, non-exclusive blanket easement, entitling Plaintiffs to monthly compensation of $41.50 per acre based on a fair market rental valuation method. Damages Decision, 93 Fed. Cl. at 479-80. The Court awarded a total of $3,043,051, plus interest, for the number of acres covered and the duration of the easement for each sensor. Id. at 488-90.

On appeal, the Federal Circuit held that the blanket easement encumbering Plaintiffs' property was a permanent rather than a temporary taking, and remanded the case to this Court for a redetermination of damages. Otay Mesa, 670 F.3d at 1369. The Federal Circuit characterized the taking as "a minimally invasive permanent easement to use undeveloped land that is unilaterally terminable by Otay Mesa." Id. at 1368. This

Court conducted a remand trial on damages in Washington, D.C. on December 11-12, 2012. Thereafter, the parties submitted post-trial briefs on February 21, 2013 and reply briefs on March 15, 2013. The Court heard closing arguments on May 1, 2013.

After three trials, two decisions from this Court, and a decision from the Federal Circuit, the parties' positions on damages remain widely divergent. Currently, Plaintiffs assert that they are entitled to approximately $5,100,000 in just compensation, while the Government argues that Plaintiffs are entitled to no more than nominal damages. Plaintiffs claim that the easement reduces the value of their developable land, and prevents the environmentally sensitive land within the parcels from being used for valuable mitigation purposes under California land use law.[1]

The Court has conducted a thorough review of the entire record in this case. For the 897 acres of land at issue on parcels 1, 3, 4, 5, and 10, approximately 278 acres are suitable for development, and 619 acres can be used for mitigation. As will be explained, the Court finds that it must treat Plaintiffs' developable land differently from the mitigation land. The Border Patrol's sensor easement would have no material effect on the developable land, because Plaintiffs may have the sensor removed upon 30 days written notice that the county has approved development. For the mitigation land, however, the Court is faced with conflicting evidence on the issue of whether the sensor easement would constitute an impediment to a contemplated mitigation use. Plaintiffs' witnesses state that the easement would preclude use of the property for mitigation, and have ascribed a 40 percent reduction in fair market value for this land. Conversely, Defendant's witnesses state that the sensor easement would pose no obstacle to the use of the property for mitigation purposes.

In weighing this conflicting evidence, the Court finds Defendant's position that the environmentally sensitive land is still suitable for mitigation to be slightly more credible. However, there is a risk to Plaintiffs that the property might not be acceptable to California authorities for mitigation because of the Border Patrol's sensor easement. Whether or not the property is ultimately deemed unsuitable, Plaintiffs were involuntarily required to assume a risk that they did not have prior to the sensor easement. The task before the Court is to place a value on this risk. A fair and reasonable outcome is to award Plaintiffs a five percent reduction in the value of their mitigation land because of the potential denial of a mitigation request. Using Plaintiffs' assessment of fair market value of $9,110,400 for the 619 acres of mitigation land, a five percent reduction results in an award of $455,520 in damages to Plaintiffs.

---

[1] In general, a real estate developer in California must acquire and set aside "mitigation land" equal to the amount of land used for development. Thus, undeveloped "mitigation land" has a significant value to anyone wanting to gain approval for a real estate development project, as further discussed in the next section.

The Court is mindful of the Federal Circuit's observation that "[i]t does not seem to us logical that Otay Mesa should receive less compensation for the taking of a permanent easement than it would for the taking of a temporary easement." Otay Mesa, 670 F.3d at 1368. However, the Federal Circuit also instructed this Court to award damages for precisely what was taken by the Government: a taking defined as "a minimally invasive permanent easement to use undeveloped land that is unilaterally terminable by Otay Mesa," the use of which cannot "affect the functionality of the property." Id. In light of this Court's discretion "to fashion an appropriate measure of compensation," id. at 1369, the Court determines that a five percent reduction of the mitigation land's fair market value is an appropriate measure of the risk that the sensor easement causes to Plaintiffs. A full analysis of the Court's reasoning is provided below.

I.      Conservation Programs and Mitigation Land

The properties at issue are all located in the Otay Mesa area of San Diego County, California. "Otay Mesa is 'sandwiched' between two fast-growing areas [Tijuana and Chula Vista] . . . [and] [t]he growth in these two areas creates a demand pressure for land that spills over into Otay Mesa." PX 6 at 8. Much of Otay Mesa, however, consists of environmentally sensitive land, which both the federal and local governments seek to preserve, while still allowing reasonable economic growth. See id. at 58-61. The United States Fish and Wildlife Service ("FWS") has determined that many endangered and threatened species and their respective critical habitats are found on portions of the subject properties. Damages Decision, 93 Fed. Cl. at 483.

Conservation programs such as the Multiple Species Conservation Program ("MSCP") and the Multiple Habitat Conservation Program identify areas of high biological value in which preservation is encouraged. PX 6 at 59. In efforts "to protect and preserve environmentally sensitive lands," regulations and ordinances dictate that development is permissible provided that the landowner mitigates any environmental impacts by preserving biologically equivalent land, called "mitigation land." Pls.' Post-Trial Br. 6, 30-32; see also Def.'s Post-Trial Br. 46.

"Mitigation land" is land that qualifies under federal, state, or local regulations as land that can be used to offset development of other environmentally sensitive land. Pls.' Post-Trial Br. 29. Generally, mitigation requires the substitution of one acre of environmentally sensitive land for another through the preservation of biologically equivalent land. Id. at 30, 32; see also Def.'s Post-Trial Br. 43. Depending on the affected habitats and species, however, the ratio of impacted acres to mitigation acres may change. PX 5 at OM_006200. Resource agencies must approve management plans for the mitigation land, which are reviewed to ensure the perpetual preservation of critical habitat and endangered species. Id. at OM_006220. A typical application for a proposed mitigation bank includes a title report "indicating any easements or other encumbrances" on the proposed property, as well as an explanation as to how any encumbrance may

affect viability for mitigation.  Id. at OM_006231 (Multi-Agency Checklist, Prospectus for Mitigation Banks).[2]  Once a plan is approved, the United States Fish and Wildlife Service, working in concert with the California Department of Fish and Game, "essentially issue 'take authorizations,'" which authorize harm to an individual species or habitat in exchange for conserving the species or habitat proportionally on other acreage. PX 6 at 60.

Given that developers may find it difficult to locate appropriate mitigation land and provide for its long-term management, FWS incentivizes the creation and management of conservation banks, which allow developers to purchase off-site compensatory habitat, known as "off-site mitigation."  PX 5 at OM_006188.  As explained by the FWS, "Landowners can profit from selling habitat or species credits to parties who need to compensate for adverse impacts to these species."  Id.  The land within an established conservation bank is actively managed and protected, thus the purchase of credits from such a bank affords developers "regulatory certainty," as well as helping them to save time and money in the event of required mitigation.  Id.

II.     2009 Damages Trial

During the 2009 damages trial, the parties presented fourteen witnesses in support of their respective positions regarding the easement's impact on the property.  In the remand trial, the parties and their experts drew upon the record established in the 2009 trial.  The Court will discuss here the relevant portions of the 2009 record that the experts relied upon in the present damages trial.

In preparing his report, Plaintiffs' expert, Mr. Randy Tagg, stated that he primarily relied on the testimony and reports of the following witnesses presented in the 2009 trial: Sean Dyer, a land entitlement and development professional; Cynthia Eldred, a San Diego land use attorney; Jim Carter, a mitigation land broker; Susan Wynn, of the U.S. Fish and Wildlife Service; and David Lawhead, of the California Department of Fish & Game.  PX 6 at 103-05; 2012 Tr. 41-42.  In addition to his reliance on these witnesses, the Government's expert, Mr. Stephen Roach, stated that he also relied upon the testimony of Michael McCollum, a private sector land consultant on environmental issues and mitigation banking, and Richard Shick, a project manager for the County of San Diego Department of Public Works.  DX 44 at 42-43; 2012 Tr. 217.  Mr. Dyer, Ms. Eldred, and Mr. Carter were all experts called by Plaintiffs during the 2009 trial, whereas

---

[2] "Note: any liens and easements on the proposed Bank Property that may affect a mitigation bank's viability will need to be resolved before a mitigation bank can be approved.  Provide a property assessment that summarizes and explains each recorded or unrecorded lien or encumbrance on, or interest in, the proposed Bank Property, including, without limitation, each exception listed in the Preliminary Title Report and describing the manner in which each encumbrance may affect the mitigation bank's operation or habitat services."  PX 5 at OM_006231.

Ms. Wynn, Mr. Lawhead, Mr. McCollum, and Mr. Shick were called by the Government. The Court will summarize the opinions of these witnesses below.

a.  Plaintiffs' Witnesses

The Court accepted Mr. Dyer as "an expert in the purchase and development of land in San Diego County." 2009 Tr. 141. Mr. Dyer testified that he "wouldn't touch this property with a 10 foot pole," as the easement was "one of the most devastating easements [he'd] ever heard of." Id. at 150, 160. Mr. Dyer's opinion was based on his assumption that the easement allowed for an unlimited number of sensors to be placed on the property: "Well, first of all, let me point out that it doesn't, to me, limit the number of sensors that can go on the property, and there's almost 43 million square feet of property here, so you could put a lot of sensors out there if you wanted to." Id. at 153. Mr. Dyer also testified that the easement "makes it very difficult to mitigate for endangered species." Id. at 150.

The Court also accepted Ms. Eldred, a land use and zoning attorney in San Diego County, as an expert. Id. at 71. She testified that "the existence of the easement itself decreases the value of the land for mitigation purposes not only because of the disturbance that it involves, but because it increases the requirements for habitat management which will then decrease the land value." Id. at 91. In her experience, "agencies have deducted from the value of property as mitigation land, if they will approve it at all, because of the existence of the ability of agencies, public or private entities, to go on the property pursuant to easements." Id. at 98.

The Court accepted Mr. Carter, a mitigation land broker in California, as an expert in mitigation. Id. at 182. He testified that the October 16, 2008 stipulation, as he reads it, "would have a pretty severe effect on using this property as mitigation," and that he was "primarily concerned with the sensitive habitats." Id. at 193, 195. Mr. Carter observed that, in his opinion, "[the] Border Patrol's normal duties, other than responding to sensor hits, . . . makes it very difficult to manage these properties for mitigation purposes." Id. at 217.

b.  Defendant's Witnesses

For the Defendant, the Court accepted Ms. Wynn as an expert, to which Plaintiffs stipulated. 2009 Tr. 861. Ms. Wynn is a biologist at the U.S. Fish and Wildlife Service, where she primarily focuses on research and protection of biological resources in San Diego County. Id. at 857-60. In particular, she actively works on implementing and amending the Multiple Species Conservation Plan, which determines which areas and species need to be conserved and mitigated, and governs the issuance of permits and monitoring of land management. Id. at 858-67. Ms. Wynn testified that the FWS, through its implementation of the MSCP, views all of the Plaintiffs' property as valuable

property for mitigation purposes.  Id. at 883-84.  Ms. Wynn acknowledged that FWS is aware of the long-present Border Patrol activities that disrupt the environmentally sensitive land, but nonetheless, "[t]here [are] a fair number of species that only occur in this vicinity[,]" id. at 884, "this is where the habitat is, this is where the species are, and there's not other options," id. at 885-86.  Ms. Wynn testified to her knowledge that the Border Patrol had placed seismic sensors on the property, but based on her observations in the field, she "believe[s] that the impacts are negligible, that they're not measurable." Id. at 887.  In her opinion, the rights granted under the easement – the right to place, access, and relocate fourteen underground sensors – would not have any effect on FWS accepting the properties for mitigation purposes.  Id. at 890-91.

The Government also presented the expert report and testimony of David Lawhead, a Staff Environmental Scientist at the California Department of Fish and Game, where, among other duties, he reviews proposed mitigation banking agreements and issues permits.  Id. at 535-36.  Based on his review of the relevant documents and his site visit, Mr. Lawhead concluded that the direct placement of the sensors and the occasional maintenance would have a "negligible effect" on biological resources, and would not cause a deduction of any mitigation credits.  Id. at 553, 560 ("The impact is much too small to be concerned.  Our assessment of its mitigation value would be a summation of all the impacts that are occurring there just looking at the current existing state of the property as a result of all the activities that have been there historically and up to the present.").  Mr. Lawhead did note, however, that the California Department of Fish and Game may want to analyze what rights the federal government has under the easement, and would perhaps seek a supplemental agreement prior to approving the land for mitigation.  Id. at 574.

Mr. McCollum, a biologist and former Chief Deputy Director of the California Department of Fish and Game, also testified on behalf of the Government.  Id. at 904-05. Mr. McCollum was accepted and testified as an expert in the field of the purchase and sale of environmental mitigation lands.  Id. at 902.  Mr. McCollum is currently employed as a land consultant involved in setting up and selling habitat mitigation.  Id. at 907.  Mr. McCollum opined that the easement and activities conducted under it would have a negligible effect on the environmental resources of the property as well as on an agency's decision to use the property for mitigation.  Id. at 908-10.

Mr. Shick, a project manager for the County of San Diego Department of Public Works, testified as an expert in the grading permit process.  Id. at 489.  Within this department, Mr. Shick "oversee[s] a team of land surveyors and engineers in the processing of entitlement and final engineering private development projects within the County of San Diego, the unincorporated area."  Id. at 486.  He reviews and approves plans and is responsible for issuing grading permits in the Otay Mesa area.  Id. at 487.  In Mr. Shick's opinion, the easement would not prevent the department from issuing a grading permit, id. at 495, although the stipulation "may result in an advisory note on the

plans advising the applicant that they would have to notify the United States within 30 days upon issuance of the permit," id. at 494.

III.    2012 Damages Trial

At the December 2012 damages trial, the parties each presented only one witness, the testimony of their respective expert.  Each expert provided an appraisal report based on the Federal Circuit's determination that the easement was permanent, as opposed to temporary.  Plaintiffs' expert, Mr. Tagg, concluded that the easement reduced the value of the developable acres by ten percent, and the mitigation acres by 40 percent.  The Government's expert, Mr. Roach, concluded that the easement has no measurable impact on the value of Plaintiffs' land.  Mr. Tagg and Mr. Roach both provided expert reports and testified in previous stages of the litigation, the liability trial and the damages trial, respectively.  Where relevant, portions of these previous reports will be addressed in this discussion.

a.    Plaintiffs' Expert – Randy A. Tagg

Plaintiffs' expert, Mr. Tagg, valued the property through "the standard before-and-after approach recommended for valuing permanent easements by the Government-published Uniform Appraisal Standards for Federal Land Acquisition."  Pls.' Post-Trial Br. 12.  In valuing real property, the key consideration is the property's "highest and best use," defined as "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future."  PX 6 at 53 (citing Uniform Appraisal Standards for Federal Land Acquisition 34 (Appraisal Institute ed., 2000)); 2012 Tr. 35.  Accordingly, Mr. Tagg first determined the highest and best use of each parcel in the before (pre-easement) condition, based upon factors such as "size, shape, topography, biology, street improvements, title report, and zoning."  Pls.' Post-Trial Br. 12-13.  Of the 897 acres covered under the blanket easement, Mr. Tagg concluded that mitigation was the highest and best use of 619 acres, and industrial development was the highest and best use of 278 acres.  Id. at 13; PX 6 at 113.

After assessing the highest and best use, Mr. Tagg used a series of comparable sales to determine the fee value, or market value, of each parcel in the before condition.  Pls.' Post-Trial Br. 14.  Mr. Tagg identified and used a total of eleven comparable sales for his valuation process.  Id. at 14, 15; PX 6 at 87.  Based upon this comparable sales analysis, Mr. Tagg concluded that the market value of the subject property in the before condition was $23,658,200.  Pls.' Post-Trial Br. 16; PX 6 at 99.  Mr. Tagg then proceeded to determine the highest and best use of the land in the after condition.  The after condition, according to Mr. Tagg's interpretation, was land burdened by a permanent, blanket easement which:

8

[A]llows the use and occupancy of the entire 897-acre Subject property by the government. The number of sensors and their locations, along with ingress/egress routes, is neither specified nor limited. Any number of seismic sensors can be placed anywhere on the five (5) Subject parcels and responders have the right to ingress/egress by any route to any location on the parcels.

PX 6 at 101. As discussed below, Mr. Tagg determined that the sensor easement impacted the value of developable and mitigation acres differently.

### i. Tagg's View of Impact on Developable Land

In assessing the impact of the sensor easement on the value of the developable land, Mr. Tagg relied on the results of his market survey and the testimony of Mr. Dyer. PX 6 at 104, 111. For his market survey, Mr. Tagg contacted seven people, only four of whom responded and participated. 2012 Tr. 158. The four who did respond were industrial developers in Otay Mesa. Id. at 86. The interviews with these four persons consisted of telephone conversations in which Mr. Tagg paraphrased the easement and inquired whether, and to what extent, the market value of the developable property would be reduced by such an easement. Id. at 86, 158.

Two of these individuals would not provide an exact value or percentage, but stated that they would pay less for the property because of the easement. Id. at 90. As a result, Mr. Tagg established a bottom range for diminution of five percent, based on his experience as an appraiser that "if a value characteristic is noticeable it has to be at least 5 percent to be measurable." Id. The other two individuals Mr. Tagg spoke with believed that the upper limit of the diminution value associated with this easement would be "close to" ten percent. Id. at 91. Out of this five to ten percent range, Mr. Tagg set the diminution in value at ten percent, reflecting the unquantifiable "self-mitigation problem." Id.[3] Accordingly, Mr. Tagg deducted ten percent from the value of the developable land within each parcel. PX 6 at 112. Mr. Tagg exchanged no written correspondence with these developers, and his work files do not contain any notes of his conversations with them. 2012 Tr. 158.

### ii. Tagg's View of Impact on Environmentally Sensitive Land

Regarding the environmentally sensitive land within the subject parcels, Mr. Tagg concluded that the easement changed the highest and best use of the land from mitigation

---

[3] Mr. Tagg explained this "self-mitigation problem" as follows: "When the mitigation acreage is no longer usable as mitigation and the property owner needs to go out into the market and buy it, that's a huge market risk. So that is an issue also. So I would conclude it at the upper range or 10 percent for that reason." 2012 Tr. 91-92.

9

to conservation, resulting in a diminution in value of 40 percent. PX 6 at 111-113. According to Mr. Tagg, "conservation land is property that is voluntarily preserved in its natural, scenic, agricultural, historical, forested, or open-space condition for reasons other than to satisfy a mitigation requirement." Pls.' Post-Trial Br. 35. Mr. Tagg explained that the basic difference between mitigation and conservation is buyer motivation. PX 6 at 106. "A purchaser of *mitigation* land buys out of necessity, and some urgency, in order to proceed with a companion development project." Id. Because "[t]iming is critical" and mitigation purchasers "must meet certain vegetation/habitat requirements and ratios in order to mitigate specifically-defined environmental damage," the demand for such property drives up the price. Id. "Conversely, *conservation* transactions are typically opportunistic purchases by non-profit conservation groups," and therefore such a use is less valuable. Id. Mr. Tagg also explained that "a conservation sale is when the property is no longer usable for mitigation . . . [if] it's not suitable for mitigation, it's not marketable for mitigation, then it's conservation." 2012 Tr. 137.

In arriving at his conclusion that the easement rendered the environmentally sensitive land unsuitable for mitigation, Mr. Tagg relied upon the testimony of expert and government witnesses in earlier proceedings in this case, and emails between Susan Wynn and the landowners. Pls.' Post-Trial Br. 17-18. These emails related to the landowners' "efforts to obtain mitigation credit for other environmentally sensitive land in the area." Id. at 17. In relevant part, Ms. Wynn explained "we do not generally give credit for mitigation purposes for . . . access roads, utility corridors, etc." and noted that "[i]f the easements allow the easement holder to disturb the site, then those areas would need to be subtracted from the total." PX 2 at 1-2.[4] Applying Ms. Wynn's statement to the Border Patrol's right "to locate, construct, operate, maintain and repair or replace the specified underground seismic intrusion sensors on the specified parcels, including the right to ingress and egress to each sensor location," PX 1 at ¶ 7, Mr. Tagg concluded that the burdened parcels were no longer suitable for mitigation, Pls.' Post-Trial Br. 18. Instead, the highest and best use of the 619 acres of environmentally sensitive land in the after condition changed from mitigation to conservation. Id.

To determine the value of these 619 acres in the after condition, Mr. Tagg reviewed comparable sales for both mitigation and conservation use within the county, and conducted a "matched-pair analysis"[5] to assess the value differences between the two uses. Id. at 19; PX 6 at 107-09. This matched-pair analysis suggested a market value reduction range of 16 to 46 percent. Pls.' Post-Trial Br. 19. Based on the fact that the easement prevented the Plaintiffs from using the environmentally sensitive land for self-

---

[4] These emails did not relate to the subject parcels, and did not discuss the specific sensor easement held by the Border Patrol. See 2012 Tr. 162.

[5] As described in Mr. Tagg's report, "[a] matched-pair analysis is an appraisal tool, using two or more pairings of otherwise very similar properties, yielding a market-derived *adjustment* for a specific value characteristic." PX 6 at 107.

mitigation, Mr. Tagg concluded that the easement reduced the market value of the land by 40 percent. Id.

Mr. Tagg bolstered his conclusion by examining three comparable properties where a market participant paid a landowner to keep a parcel of land off the market for a specific time period. Id. at 20; PX 6 at 114-15. Using a mid-range value of $600 per year as the market value and a ten percent capitalization rate, this valuation approach yielded a comparable reduction of 40 percent of the market value of the environmentally sensitive land. Pls.' Post-Trial Br. 20; PX 6 at 114-15.

In Mr. Tagg's 2009 appraisal report, he had concluded that the highest and best use of all 897 acres in the after condition was mitigation. PX 6 at 78. The reason for the change in his 2012 report, he explained, was the Federal Circuit's determination "that the sensor easement is a *permanent/blanket* encumbrance," which is different than the 2009 premise of a temporary easement. Id.; 2012 Tr. 109. Although Mr. Tagg "never looked at the issue" of how the Border Patrol's rights differed under a permanent easement, 2012 Tr. 110, in his professional opinion, a permanent easement has a significantly greater impact on the suitability of the environmentally sensitive land for mitigation, id.

### b. Defendant's Expert – Stephen Roach

Similar to Mr. Tagg, Defendant's expert Mr. Roach valued the properties through a before and after valuation method based on highest and best use. Mr. Roach agreed with Mr. Tagg that the highest and best uses of the subject parcels in the before condition were either mitigation or industrial development. Def.'s Post-Trial Br. 42; DX 44 at 31-32. Like Mr. Tagg, Mr. Roach then used a sales comparison approach to value each of the subject properties in the before condition, reviewing eleven different comparable sales, and arrived at a total value of $16,271,150 for the properties. DX 44 at 30, 41.

Mr. Roach then analyzed the permanent, blanket easement, which he viewed as permitting the placement of no more than fourteen sensors on the property. DX 44 at 42; 2012 Tr. 395. Upon reviewing expert reports and testimony from representatives of the relevant government agencies, Mr. Roach surmised that "[t]he easement has no impact on future development, nor does it preclude use of the land as mitigation," DX 44 at 42, and accordingly, "the impact of the easement on each subject parcel is de minimis," id. at 44. Unlike Mr. Tagg's conclusion, Mr. Roach found that the easement did not alter the highest and best use of the acres within each parcel. Therefore, under Mr. Roach's analysis, "the easement has no measurable impact on value, and . . . the market value in the after condition is no different than the value of each subject parcel in the before condition." DX 44 at 47.

### i. Roach's View of Impact on Developable Land

Mr. Roach concluded that the sensor easement has no measurable effect on the suitability of the developable land for future development. His primary basis for this conclusion was the easement language itself, which provides:

> Should the landowner desire to develop any portion of the subject parcel, the sensor will be removed or redeployed upon 30 days written notice that a grading permit has been issued by the County of San Diego permitting development of all or a portion of the property. Upon removal of a sensor, the portion of the easement relating to that sensor shall terminate.

PX 1 at ¶ 7. Mr. Roach also relied upon the testimony of Mr. Shick of the County of San Diego Department of Public Works, who stated that, based on his experience, the easement would not result in the Department "not issuing the permit. I think it would just result in an advisory note on the plan." Id. at 495.

### ii. Roach's View of Impact on Environmentally Sensitive Land

Similar to his conclusion regarding impact on the developable land, Mr. Roach also concluded that the sensor easement has no measurable impact on the suitability of the environmentally sensitive land for mitigation. In reaching this conclusion, Mr. Roach relied upon the testimony and reports of Ms. Wynn of the U.S. Fish and Wildlife Service and Mr. Lawhead of the California Department of Fish and Game. DX 44 at 42. Given that the approval process for mitigation involves mostly state and federal resource agencies, and representatives from these agencies opined that the easement would have no impact on the acceptance of the land for mitigation, Mr. Roach concluded that the easement impact on the environmentally sensitive land is negligible. DX 44 at 42, 44.

At trial, Mr. Roach challenged Mr. Tagg's adoption of "conservation" as a highest and best use, explaining that "[c]onservation and preservation are not economic uses. They have no economic basis behind them. They have no economic intent behind them." 2012 Tr. 191. Mr. Roach noted that, although a buyer's intentions may be helpful in conducting an appraisal, such intentions are not determinative:

> I might have a piece of property in downtown San Diego that's a vacant parcel of land that has a highest and best use to build a highrise condo project, but the buyer intends to devote it to surface parking because all they want to do is operate it as a parking lot or they're an investor and they want to hold it. That doesn't make parking the highest and best use.

12

A12

Id. at 191-92.  Accordingly, because the environmentally sensitive land may still be used for mitigation purposes, appraisal standards dictate that the highest and best use of that land is mitigation.  DX 44 at 31.  In these circumstances, the easement has no effect on the highest and best use of the subject properties and therefore did not cause any diminution in value.

DISCUSSION

Cases before this Court on remand are governed by the mandate rule.  Carolina Power & Light Co. v. United States, 98 Fed. Cl. 785, 794 (2011).  "[E]very appellate court judgment vests jurisdiction in the trial court to carry out some further proceedings."  Exxon Chem. Patents, Inc. v. Lubrizol Corp., 137 F.3d 1475, 1483 (Fed. Cir. 1998).  As the district court's actions on remand "should not be inconsistent with either the letter or the spirit of the mandate," Laitrim Corp. v. NEC Corp., 115 F.3d 947, 950-51 (Fed. Cir. 1997), mandates should be interpreted by looking at the language of the judgment in combination with the accompanying opinion, Exxon Chem., 137 F.3d at 1483 (citing, inter alia, In re Sanford Fork & Tool Co., 160 U.S. 247, 256 (1895)).

Here, the Federal Circuit's mandate instructs this Court to "determine damages based upon the Border Patrol having taken a permanent blanket easement over Otay Mesa's property, as set forth in the stipulation."  Otay Mesa, 670 F.3d at 1368.  In cases of a permanent taking by easement, damages are often determined through a diminution in value approach.  Id. at 1369.  The Federal Circuit highlighted the fact, however, that this approach is but one appropriate method of valuation, and noted that "on remand the Court of Federal Claims will have discretion in identifying a methodology that fulfills the goal of awarding Otay Mesa just compensation."  Id.  It further instructed that the awarded compensation be for "exactly what [the Federal Circuit] identified as having been taken in this case," namely, "a minimally invasive permanent easement to use undeveloped land that is unilaterally terminable by Otay Mesa."  670 F.3d at 1368-69.  The Court's undertaking of this task follows.

I.      Just Compensation

Under the Fifth Amendment, "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  Accordingly, when government action results in a taking of private property rights, the Constitution requires compensation.  See, e.g., First Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles, 482 U.S. 304, 314-15 (1987).  The landowner bears the burden of proving the value of the land taken for purposes of obtaining just compensation.  See Bd. of Cnty. Supervisors of Prince William Cnty., VA v. United States, 276 F.3d 1359, 1364 (Fed. Cir. 2002).  When less than an entire interest is taken, just compensation is traditionally determined by comparing the difference in market value immediately before and immediately after the taking.  See, e.g., United States v. Miller, 317 U.S. 369, 376 (1943).

Inability to show a diminution in value does not preclude recovery, as damages may be assessed based on the cost of cure, *i.e.* the costs associated with mediating or preventing the injury. Vaizburd v. United States, 384 F.3d 1278, 1285-86 (Fed. Cir. 2004) (remanding for a determination of whether plaintiff presented "sufficient evidence to establish that they reasonably incurred costs to remove the accreted sand"); Ridge Line, Inc. v. United States, 346 F.3d 1346, 1358-59 (Fed. Cir. 2003) (remanding for a determination of damages notwithstanding the lack of a before and after appraisal). The Court of Federal Claims does not have jurisdiction, however, to award nominal damages. Vaizburd, 384 F.3d at 1283 (citing Marion & Rye Valley Ry. Co. v. United States, 270 U.S. 280, 282 (1926)).

II.     The Government's Concession of Liability

In its October 16, 2008 concession of liability, the Government admitted to the installation of fourteen sensors on parcels 1, 3, 4, 5, and 10 of Plaintiffs' property. PX 1 at ¶ 5. Much debate has centered on the parameters of the rights the Government possesses under the easement. The Government maintains that the easement circumscribes the Government's rights to the fourteen stipulated sensors, whereas Plaintiffs argue that "[n]othing in the easement . . . limits the Government to 14 sensors (or any other number)." Pls.' Post-Trial Resp. 47. An additional point of contention is what types of sensors are allowed to be placed on the property. Therefore, as a starting point, the Court will review the stipulation language to determine the extent of the rights held by the Government, given that "[c]ompensation should be based on an assessment of precisely what the government takes from a landowner." Otay Mesa, 670 F.3d at 1368 (citing United States v. Gen. Motors Corp., 323 U.S. 373, 382 (1945)).

In paragraph three of the stipulation, the Government explains the need for and the type of intrusion on Plaintiffs' property:

> As part of its patrol of the border area, the Border Patrol has the need to place seismic intrusion sensors (hereinafter, "sensors") at various underground locations on undeveloped property in the vicinity of the border for the purposes of apprehending aliens attempting illegal entry. These sensors are each approximately one cubic foot in size. Once buried in the ground, an approximately one foot long antenna extends above ground from the sensor.

PX 1 at ¶ 3. The Government then lists fourteen specific sensors and their general locations, and stipulates that "*by virtue of its placement of the 14 sensors specified above on the listed parcels of land, it has taken a property interest in the nature of an easement over the parcel of land on which the sensors have been placed.*" Id. at ¶¶ 5-6 (emphasis added). The stipulation goes on to describe the easement more fully, stating that it is:

14

A14

> A perpetual and assignable easement to locate, construct, operate, maintain and repair or replace *the specified underground seismic intrusion sensors on the specified parcels*, including the right to ingress and egress to each sensor location.

Id. at ¶ 7 (emphasis added). In the Court's view, the plain language of the easement gives the Government the right "to locate, construct, operate, maintain and repair" *only* those fourteen underground seismic intrusion sensors listed within paragraph five of the stipulation. This determination does not alter the fact that the Government has a "blanket" easement, as the easement "language suggests that the Border Patrol may place its fourteen sensors anywhere on the five parcels and move them to different locations as desired." Damages Decision, 93 Fed. Cl. at 486, 487 (noting that Plaintiffs were due just compensation for "the Government's taking of an easement to place fourteen sensors"). However, there may not be more than a total of fourteen sensors on the properties at any given time. This reading is reinforced by the Federal Circuit's explanation that "upon removal of a sensor, the portion of the easement relating to that sensor terminates." Otay Mesa, 670 F.3d at 1369. If the easement granted the Government the right to place an unlimited number of sensors on the subject property, there would be no reason to tether the easement rights to the individual sensors already on the parcels.

Plaintiffs make much of email correspondence between counsel for the Government, Lary Larson, and one of the Government's witnesses, David Lawhead of the California Department of Fish and Game. See, e.g., Pls.' Post-Trial Resp. 48. Prompted by Mr. Lawhead's email inquiry on whether the easement sets a maximum of fourteen sensors, Mr. Larson replied "Basically we admitted liability for 14. Conceivably Border patrol could add more. . . . Border Patrol can answer any questions you have directly[.]" PX 254. The Court does not agree with Plaintiffs' implication that this email is an admission establishing the Border Patrol's right to place an unlimited number of sensors on Plaintiffs' property. In this email, Mr. Larson made no authoritative statements regarding the parameters of the easement, and instead referred Mr. Lawhead to the Border Patrol for any questions he may have. Moreover, the stipulation itself is a legally binding document, and one which, as demonstrated above, is confined to fourteen sensors. Mr. Larson's email does not change the meaning of the Government's document.

Plaintiffs postulate that in future years, the Border Patrol may use larger, more intrusive sensors, consistent with the easement's language. The Government rejects this supposition, pointing to testimony by Border Patrol agents regarding the specific sensors used, as well as their dimensions. Def.'s Post-Trial Br. 8 (citing 2009 Tr. 809-10 (Herrara)). As quoted above, the stipulation defines the sensors as being "each approximately one cubic foot in size. Once buried in the ground, an approximately one

foot long antenna extends above ground from the sensor." PX 1 at ¶ 3. Plaintiffs are correct in pointing out that technology, and subsequently, the sensors themselves, may change throughout the years. Any future sensors, however, cannot exceed the measurements contained in the stipulation; otherwise, the Government will have exceeded the parameters of its easement.

For purposes of determining just compensation, the Government has taken the right to locate, construct, operate, maintain, repair, or replace fourteen seismic sensors, approximately one cubic foot in size with an approximately one foot long antenna, on Plaintiffs' property. To the extent any of the witnesses premise their valuation conclusions on the Border Patrol's ability to place more than fourteen sensors, their evaluation is flawed.

III.    Impact of the Border Patrol's Easement

Based on the evidence presented during the three trials as well as the Federal Circuit's remand instructions, Plaintiffs contend that the sensor easement caused a ten percent diminution in value of the developable land, and a 40 percent diminution in value of the environmentally sensitive land. The Government maintains that any impact on either type of land is negligible or nonexistent. Below, the Court presents its conclusions from the competing arguments and evidence of each side, concerning both categories of land.

a.  No Impact on Developable Land

Plaintiffs contend that the easement reduced the value of the 278 acres of industrial land by ten percent, entitling them to just compensation of $1,454,780. Pls.' Post-Trial Br. 16-17; PX 6 at 115. The support for this assertion is the testimony of Mr. Dyer in the 2009 trial and the results of Mr. Tagg's market survey, both discussed above. Plaintiffs characterize Mr. Tagg's industrial land analysis as "flexible and robust," asserting that "Tagg found ample, reliable evidence supporting his conclusion that the sensor easement caused a 10% reduction in value of the industrial property[.]" Pls.' Post-Trial Resp. 9. The Court, however, finds this analysis less than compelling.

During the 2009 trial, Mr. Dyer spoke generally, and sometimes hyperbolically, regarding the negative implications of the Border Patrol's sensor easement. Mr. Dyer's opinion is based on the assumption that the easement does not limit the number of sensors, a factual predicate this Court has rejected. This mistaken assumption, combined with the pervasive generalities in his testimony, render Mr. Dyer's opinion minimally persuasive. Accordingly, to the extent Mr. Tagg relied upon Mr. Dyer's testimony, his conclusion of a ten percent reduction in value is dubious.

Mr. Tagg's market survey results suffer from similar flaws. To "confirm[] the market perception" of a diminution in value, Mr. Tagg conducted a market survey of Otay Mesa industrial developers. PX 6 at 111. Although Mr. Tagg presented the results of this survey as a "general consensus of damage" of five to ten percent of the fee value, id., a closer review of his survey methodology and results belies this broad characterization. In conducting his survey, Mr. Tagg called seven different people, only four of whom responded. 2012 Tr. 158. With the four participants, Mr. Tagg conducted telephone calls during which he paraphrased the easement and inquired as to what they believed the diminution in land value would be if subjected to such an easement. Id. at 86. Two of the participants refused to estimate any numerical impact. See id. at 90 ("Judd Halenza and John Dillard, I twisted their arm to give me a percentage and they wouldn't. They wouldn't do it."). Nonetheless, based on the conversations with these two participants, Mr. Tagg established a bottom percentage of five percent for the diminution in value. Id. at 90-91. Based on conversations with two other participants, Kaitlin Murphy and John Bragg, Mr. Tagg established an upper limit of ten percent for the diminution in value. Id. at 91. Within this range, Mr. Tagg concluded that the diminution in value of the developable land was ten percent, because the land was not suitable for self-mitigation. Id. at 91-92.

Although there are no records of these conversations, it seems eminently logical that in this "paraphrasing," Mr. Tagg informed the participants of his own interpretation of the easement, to wit, that it allows the Border Patrol to place an unlimited number of sensors on the property. Thus, at the outset, the responses of the survey participants are minimally persuasive, because they were based on an easement that allows for an unlimited number of sensors, as opposed to the limited number of fourteen sensors. See Fed. R. Evid. 702 (expert testimony is reliable and trustworthy when "the testimony is the product of reliable principles and methods . . . and the expert has reliably applied the principles and methods to the facts of the case"); Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 453 (D. N.J. 2009) (oral survey question that omitted information from subject document, thereby changing meaning of document, rendered the survey "unreliable, inconclusive and lacking fit to the facts in issue"). Even disregarding this fundamental alteration of the rights permitted under the easement, in the Court's view, the general responses from four out of seven developers hardly indicates that "[t]he general consensus of damage, related to this easement encumbrance, is 5% to 10% of the fee value," much less provides "ample, reliable evidence." PX 6 at 111; Pls.' Post-Trial Resp. 9. This casual, undocumented, and narrow "survey" fails to evince that Plaintiffs are entitled to $1,454,780 in damages for the industrial development land.

The Court finds the testimony of Mr. Shick, in which he stated that the easement would not impact the development approval process, much more instructive. 2009 Tr. 494-95. Mr. Shick was designated by San Diego County "[a]s the most knowledgeable in the department" on the impact of the easement to receive grading permits for development. Id. at 487, 489; Def.'s Post-Trial Br. 56. Moreover, Mr. Tagg confirmed

Mr. Shick's informed opinion during the damages trial, when he testified that "[u]nder the easement the property owner can still pursue development," and the sensors will not have any effect on the commercial development of developable land. 2009 Tr. 775. Accordingly, the Court finds that Plaintiffs have failed to prove actual damages with respect to a diminution in value of developable land.

    b.  Impact on Mitigation Land

Plaintiffs claim that the easement rendered the 619 acres of environmentally sensitive land unsuitable for mitigation, resulting in a 40 percent diminution in value. In support of this theory, Plaintiffs rely on Mr. Tagg's report, which in turn relies upon the testimony of Mr. Dyer, Ms. Eldred, and Mr. Carter. Mr. Tagg also relied on documents relevant to mitigation and conservation efforts of other parcels within the area, such as emails from Ms. Wynn and existing conservation easements. Pls.' Post-Trial Br. 10, 17. In contrast, the Government contends that the easement and the Border Patrol's activities under the easement have no measurable effect on the suitability of the environmentally sensitive land for mitigation. The Government's conclusion is supported by the appraisal report and testimony of Mr. Roach, who in turn relied upon the testimony of, *inter alia*, Ms. Wynn of the Fish and Wildlife Service and Mr. Lawhead of the California Department of Fish and Game. DX 44 at 12.

In valuing the easement, Mr. Tagg assumed that "[t]he number of sensors . . . is neither specified nor limited." PX 6 at 101. Mr. Dyer was also of the opinion that the Border Patrol could place an unlimited number of sensors under the easement. 2009 Tr. 153; PX 6 at 104. Because of this assumption, both Mr. Tagg and Mr. Dyer deemed the opinion of Mr. Lawhead, of the California Department of Fish and Game, irrelevant, as he viewed the easement as allowing only fourteen sensors. Id.; 2009 Tr. 158.

As the Court has repeatedly instructed, it "only will evaluate the just compensation due Plaintiffs as a result of the Government's taking of an easement to place fourteen sensors anywhere on five parcels of Plaintiffs' property and to access the sensors." Damages Decision, 93 Fed. Cl. at 487; see also Otay Mesa, 670 F.3d at 1369 ("we reiterate that the focus of the damages analysis must always remain on awarding just compensation for what has been taken."). Mr. Tagg himself pointed out that an easement limited to fourteen sensors "is a very different and far less burdensome property interest." PX 6 at 105. Therefore, by Mr. Tagg's own admission, he determined the diminution of value based on a significantly different property interest. It is axiomatic that "[a]n expert opinion is no better than the soundness of the reasons supporting it." Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (citing cases).

Plaintiffs further argue that concessions of Ms. Wynn establish that the FWS would not grant mitigation credits for the environmentally sensitive land, thus substantially reducing the value of the property. In making this argument, Plaintiffs point

to two emails exchanged between Ms. Wynn and the landowners, in which they discussed mitigation credits for parcels not at issue in this case. Pls.' Post-Trial Br. 17-18. In the first of these emails, dated November 7, 2011, Ms. Wynn explained "we do not generally give credit for mitigation purposes for storm water facilities, access roads, utility corridors, etc." PX 2 at 1. This general statement is consistent with the stance of wildlife agencies to reduce mitigation credits for significant intrusions, but not for small intrusions. <u>Damages Decision</u>, 93 Fed. Cl. at 483-84 (citing DX 67 at 4). Although the Border Patrol's easement grants agents ingress and egress to the sensors, it does not permit the Border Patrol to construct "storm water facilities, access roads, utility corridors, etc." PX 2 at 1; <u>see also</u> PX 1 at ¶ 7 (defining the easement as "including the right to ingress and egress to each sensor location . . . . No rights other than those specifically enumerated in this paragraph are being acquired."). In contrast, the easement is "minimally invasive," <u>Otay Mesa</u>, 670 F.3d at 1368, with only negligible effects on the biological resources, 2009 Tr. 887 (Wynn), 2009 Tr. 553 (Lawhead).

In the second of Ms. Wynn's emails, dated January 9, 2012, she discussed the need to review title reports prior to finalizing a conservation maintenance agreement:

> With regards to the title reports, I thought that the county was going to review them and provide us with some feed back on whether the easements would allow the site to be disturbed for roads, access, pipelines etc – review of title reports is a bit out of my area of expertise. If the easements allow the easement holders to disturb the site, then those areas would need to be subtracted from the total[.]

PX 2 at 2. As in the November 7, 2011 email, Ms. Wynn communicated general principles regarding permissible intrusions on mitigation land. Similarly, this email correspondence does not relate to any of the subject parcels, but instead discusses easements entirely different from the sensor easement at issue here. 2012 Tr. 162. Mr. Tagg himself described the present easement as "unique. There is nothing like it. There is no property that I'm aware of encumbered with a similar easement." <u>Id.</u> at 85-86. As Ms. Wynn testified, the subject parcels have habitat that is a high priority for conservation, as some endangered species only occur in the relevant vicinity. 2009 Tr. 884. Thus, given that "[c]onservation banks are a flexible means of meeting a variety of conservation needs of listed species," PX 5 at OM_006192, the unique, minimally invasive nature of the easement, combined with the strong desire on the part of wildlife agencies to preserve the rare habitat on the subject properties, leads this Court to conclude that Ms. Wynn's emails are not applicable to the subject parcels, much less dispositive.

Finally, Plaintiffs point to a conservation easement covering a 92-acre plot of land that several of the landowners granted to San Diego County as mitigation for

development.  PX 3; Pls.' Post-Trial Br. 10.  This document lists prohibited uses of the land, which include "[u]se of off-road vehicles and use of other motorized vehicles except on existing roadways and except as may be required for land management purposes."  PX 3 at 2.  These prohibited uses are consistent with the U.S. Fish and Wildlife's Guidance for the Establishment, Use, and Operation of Conservation Banks, which states that "an active management program – to . . . prevent an area's use by off-road vehicles, illegal garbage dumpers or others; and address myriad other threats – is essential to ensure that the potential conservation value of a particular property is realized and maintained."  PX 5 at OM_006197.  Plaintiffs argue that because the Border Patrol's easement does not specifically preclude the Border Patrol from accessing the sensors with off-road vehicles, the potential biological destruction from these hypothetical access scenarios vitiates the suitability of the property for mitigation.

The Border Patrol had been traversing Plaintiffs' land in such vehicles prior to the imposition of the easement, <u>Liability Decision</u>, 86 Fed. Cl. at 785, a time frame in which Plaintiffs maintain the properties were suitable for mitigation, Pls.' Post-Trial Br. 13-14 (asserting that the property contained 619 acres of mitigation land in the before condition).  Any claims Plaintiffs may have had regarding this Border Patrol presence are time barred.  <u>Liability Decision</u>, 86 Fed. Cl. at 785-86.  Additionally, "[s]ince at least 1982, members of the general public have used the subject property for recreational purposes such as riding off-road vehicles."  <u>Id.</u> at 785 (listing trucks, ATVs, motorcycles, and emergency response vehicles); <u>see also</u> 2012 Tr. 121-22 (Tagg) (admitting that, in the before condition, illegal entrants and off-road recreational vehicles users traversed the subject parcels); 2009 Tr. 216 (Carter) (admitting "there are a lot of other activities on the property in additional to the sensors" that would contribute substantially to the management costs).  The parties have presented no method of determining what percentage, if any, of the land's environmental degradation was caused by sensor activity.  Even if the Court were to accept the premise that the land is no longer suitable for mitigation, Plaintiffs ostensibly ask the Court to disregard the extensive evidence of destructive activity conducted on the land by the Border Patrol and the public, and instead attribute the entirety of this "damage" to the placement of fourteen sensors across 897 acres.

Despite the Court's conclusion that the conflicting evidence tilts in Defendant's favor, the Court is not convinced that a landowner would willingly convey an interest in land to the Government for absolutely no compensation whatsoever, nor that the encumbrance has absolutely no effect on the value of the subject property.  In determining compensation due, a court exercises its reasonable judgment "with the aid of all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken[.]"  <u>Kimball Laundry Co. v. United States</u>, 338 U.S. 1, 20 (1949).  Here, Plaintiffs undeniably face a risk that their environmentally sensitive property will not be approved for mitigation use.  The Court does not assess this risk to be anywhere near the 40 percent level advocated by Mr. Tagg, but the risk is significant

enough that the Court cannot accept the Government's position of a zero impact either. For Plaintiffs to assume this risk without any compensation for the admitted Fifth Amendment taking would leave Plaintiffs in a worse position than before the taking occurred. See Olson v. United States, 292 U.S. 246, 255 (1934) ("[Plaintiff] is entitled to be put in as good a position pecuniarily as if his property had not been taken."). Plaintiffs did not bear this risk in the "before" condition, and certainly it is plausible that the Government's sensor easement might prevent the use of Plaintiffs' property for mitigation purposes. Even if this outcome never occurs, Plaintiffs' assumption of the risk should be ascribed some value.

In the Court's view, fair and reasonable compensation is to award Plaintiffs five percent of the $9,110,400 fair market value appraisal for the 619 acres of mitigation land. PX 6 at 99. Five percent of the fair market value is $455,520, which is the amount of damages awarded to Plaintiffs on remand from the Federal Circuit. The Court is aware that the parties have debated the validity of the experts' fair market value appraisals, but Mr. Tagg was the only person who set a fair market value for the 619 acres of mitigation land. Id. Even if Mr. Tagg's appraisal may lack perfection, it is the best evidence available. At a damages award of five percent of the appraised amount, any adjustment to Mr. Tagg's fair market value appraisal would have only minimal effect on the final result.

CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs are entitled to just compensation of $455,520, plus interest. The Court awards Plaintiffs compounded interest from October 16, 2008, the date on which Plaintiffs became aware of the taking through the Government's filing of the stipulation. Consistent with the previous decision, the interest computation shall be based on the rate set forth in the Contract Disputes Act ("CDA"), 41 U.S.C. § 7109. Damages Decision, 93 Fed. Cl. at 491. The Court requests that the parties submit a joint filing on or before June 10, 2013 stating the proper interest amount to be paid under the CDA. The entry of judgment will be stayed pending the determination of the proper amount of interest to which Plaintiffs are entitled.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge

21

A21

# In the United States Court of Federal Claims

No. 06-167L (and consolidated cases)

(Filed: July 8, 2013)

```
***********************************
                                  *
OTAY MESA PROPERTY, L.P., et al., *
                                  *
                                  *    Motion for Reconsideration; Recovery
                    Plaintiffs,   *    of Interest for Permanent Taking of
                                  *    Non-Exclusive Easement Under Fifth
v.                                *    Amendment; Determination of the
                                  *    Starting Date for Calculation of
THE UNITED STATES,                *    Interest.
                                  *
                    Defendant.    *
                                  *
***********************************
```

*Roger J. Marzulla*, with whom was *Nancie G. Marzulla*, Marzulla Law, LLC, Washington, D.C., for Plaintiffs.

*Lary C. Larson*, with whom were *Ignacia S. Moreno*, Assistant Attorney General, and *Joshua A. Doan*, Trial Attorney, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., *Michael Felts*, Senior Attorney, United States Customs and Border Protection, Of Counsel, for Defendant.

## OPINION AND ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION

WHEELER, Judge.

On May 30, 2013, the Court issued an opinion and order awarding $455,520 in damages to Plaintiffs, plus compound interest from October 16, 2008 until the date of payment. Otay Mesa Prop., L.P. v. United States, 110 Fed. Cl. 732, 747 (2013). The Court selected the date to commence the running of interest based upon the Government's filing of a "stipulation" on October 16, 2008 acknowledging that a Fifth Amendment taking had occurred through the placement of seismic intrusion sensors on Plaintiffs' property. Id. The Court ruled that the interest computation should be based on the rate set forth in the Contract Disputes Act ("CDA"), 41 U.S.C. § 7109. Id. The Court

asked the parties to submit a joint filing by June 10, 2013 stating the proper interest amount to be paid under the CDA. Id.

Instead of filing a proposed interest calculation on June 10, 2013, Plaintiffs filed a motion for reconsideration asking the Court to begin the running of interest from April 1999 when the first sensor was installed on Plaintiffs' property. Plaintiffs assert that interest should run from the date of the taking in 1999, not from the date when the Government filed its concession of liability for the taking in 2008. Plaintiffs emphasize that in an earlier opinion, Otay Mesa Property, L.P. v. United States, 93 Fed. Cl. 476, 491 (2010), the Court had calculated interest from April 1999, which the Government did not challenge on appeal. Thus, while the Federal Circuit determined that the taking should be considered permanent instead of temporary, Otay Mesa Property, L.P. v. United States, 670 F.3d 1358, 1368 (Fed. Cir. 2012), Plaintiffs argue that the appellate court did not alter the ruling on interest.

The Government opposed Plaintiffs' motion for reconsideration on June 25, 2013, arguing that the Court properly commenced the running of interest from the date when the Government filed its stipulation. The Government points out that the first version of the stipulation was filed on August 28, 2008, and that the October 16, 2008 filing was an amended version intended to correct certain inaccuracies in the first stipulation. The Government does not object to running the interest calculation from the date when Plaintiffs first received notice of the taking on August 28, 2008, but otherwise the Government objects to Plaintiffs' motion. The Government contends that Plaintiffs would receive a windfall if interest ran from April 1999, because only one sensor on one parcel of land had been installed at that time.

Plaintiffs filed a reply on July 1, 2013. The Court deems oral argument unnecessary, and therefore proceeds to its decision.

Discussion

The Court acknowledges the existence of ample case law holding that interest in a Fifth Amendment taking should run from the date of the taking. See, e.g., Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984) (owner is entitled to interest so he is placed in as good a position as he would have occupied if payment had coincided with the taking); Jacobs v. United States, 290 U.S. 13, 16-17 (1933) (owner is entitled to interest to produce the equivalent of the value if paid at the time of the taking). This principle recognizes the time value of money and the opportunity a plaintiff has lost to earn income on its damages award. Whitney Benefits, Inc. v. United States, 30 Fed. Cl. 411, 413 (1994). A delay in payment is also a delay in the use of the money. ITT Corp. v. United States, 17 Cl. Ct. 199, 240 (1989).

2

In the first damages decision in this case, the Court considered the Government's placement of seismic intrusion sensors on Plaintiffs' property to be a temporary taking. It awarded damages to Plaintiffs at a rental value of $41.50 per acre per month based upon the fair market value as determined from comparable non-exclusive leases in the same region. Otay Mesa, 93 Fed. Cl. at 489-90. The Court authorized the interest calculation from the date of sensor installation on each of five parcels of land. Id. at 491. Viewed on a rental value basis, the Court found it appropriate to compute interest from the date of sensor installation, because the Government did not pay rent to Plaintiffs when due, from as early as April 1999. The rental value approach, and a longer period of interest, would have resulted in a larger damages award to Plaintiffs, but the Federal Circuit determined that the Government's use of seismic intrusion sensors on Plaintiffs' property constituted a permanent taking instead of a temporary taking. Otay Mesa, 670 F.3d at 1368.

Following the direction of the appellate court that the Government's placement of sensors on Plaintiffs' property is a permanent taking, the Court used a completely different approach in determining reasonable and appropriate damages. As explained in the May 30, 2013 decision on damages, the Court ascribed a value to the risk Plaintiffs assumed in having their property subjected to a Government easement. Otay Mesa, 110 Fed. Cl. at 747. The risk is that California authorities may not approve the use of Plaintiffs' property for mitigation purposes because of the Government's sensor easement. Plaintiffs did not have this risk prior to the Government's taking of a non-exclusive easement.

The Government first divulged the existence of the sensors to Plaintiffs through the filing of the stipulation on August 28, 2008. Before that date, only the Government knew that the sensors were in use on Plaintiffs' property. If no person or entity outside of the Government was aware of the sensors until the disclosure date in 2008, the risk on which the Court's damages award is based did not exist until 2008. Indeed, the record shows that Plaintiffs were able to use portions of their property for mitigation purposes in 2003, before the existence of the easement had been disclosed but after sensors had been placed on the property. Otay Mesa, 93 Fed. Cl. at 484 (citing Carter, Tr. 203-04, 209-12, DX 26, 27).

Therefore, the operative date to begin the assessment of interest is August 28, 2008, because until the date of easement disclosure, there was no risk to Plaintiffs that the easement would affect California's approval of land use for mitigation purposes. Under a permanent taking theory, there simply is no basis to award damages of any kind to Plaintiffs prior to the Government's disclosure of the easement. Accordingly, Plaintiffs' motion for reconsideration is GRANTED IN PART to adjust the commencement date for interest to August 28, 2008, but in all other requests Plaintiffs' motion is DENIED.

The parties again are requested to submit a joint filing on or before July 19, 2013 updating their respective positions on the proper interest amount to be paid under the

3

CDA.  The entry of judgment will be stayed pending the determination of the amount of interest to which Plaintiffs are entitled.

IT IS SO ORDERED.

<u>s/Thomas C. Wheeler</u>
THOMAS C. WHEELER
Judge

4

# In the United States Court of Federal Claims

No. 06-167L (and consolidated cases)

(Filed: July 22, 2013)

```
************************************ *
                                    *
OTAY MESA PROPERTY, L.P., et al.,   *
                                    *
                                    *
            Plaintiffs,             *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
                                    *
************************************ *
```

### ORDER FOR ENTRY OF FINAL JUDGMENT

In its May 30, 2013 opinion and order, the Court awarded Plaintiffs just compensation of $455,520 plus interest, using Contract Disputes Act ("CDA") interest rates. Thereafter, Plaintiffs filed a motion for reconsideration, requesting, *inter alia*, that the Court amend the date from which interest should run, from October 16, 2008 to August 28, 2008. In its July 8, 2013 opinion granting in part and denying in part Plaintiffs' motion for reconsideration, the Court amended the start date for the running of interest to August 28, 2008, and ordered the parties to submit a joint filing updating their respective positions on the proper interest amount to be paid under the CDA.

On July 19, 2013, counsel for the Government submitted a joint filing on interest. As of the date of that filing, $74,555.23 had accrued in interest since August 28, 2008. Interest will continue to accrue at a rate of $25.22 per day through December 31, 2013, when the CDA rate is subject to change. Plaintiffs are entitled to interest at the CDA rate, compounded annually, between the date of judgment and the date of payment by the United States. Accordingly, the Court directs the Clerk to enter judgment for Plaintiffs in the amount of $455,520, together with $74,555.23 in interest, plus accruing interest of $25.22 per day until the date of payment.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge

United States Court of Appeals
for the Federal Circuit

**CERTIFICATE OF SERVICE**

Otay Mesa Prepoerty, L.P. v. United States No. 2013-5122, 2014-5002

I, Robyn  Cocho, being duly sworn according to law and being over the age

of 18, upon my oath depose and say that:

Counsel Press  was  retained  by Marzulla Law, LLC,  Attorneys  for

Plaintiffs-Appellants to print this document.  I am an employee of Counsel Press.

On **December 9, 2013**, Counsel for Appellant has authorized me to

electronically file the foregoing **Brief of Plaintiffs-Appellants** with the Clerk of

Court  using  the  CM/ECF System,  which  will  send  notice  of  such  filing  to  the

following registered CM/ECF users:

John Emad Arbab, Esquire
Department of Justice
Environment and Natural Resources Division
P.O. Box 7415
Washington, DC  20044

*Attorneys for Defendant-Cross-Appellant*

A courtesy copy will be sent upon approval of the court.

Upon acceptance by the Court of the e-filed document, six paper copies will

filed with the Court, via Federal Express, within the time provided in the Court's

rules.

/s/ Robyn Cocho
Counsel Press

December 9, 2013

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

   x    The brief contains   12,087   words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

\_\_\_\_ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   x    The brief has been prepared in a proportionally spaced typeface using  MS Word 2002  in a 14 point Times New Roman font or

\_\_\_\_ The brief has been prepared in a monospaced typeface using MS Word 2002  in a \_\_\_ characters per inch_____ font.

   s/  Roger J. Marzulla   
Roger J. Marzulla

December 9, 2013